281 F.2d 42
 BATTLE CREEK GAS COMPANY, Petitioner,
Illinois Power Company, Intervenor,
v.
FEDERAL POWER COMMISSION, Respondent,
Trunkline Gas Company, Consumers Power Company and Michigan Gas Storage Company, and Michigan Gas Utilities Company, Intervenors.
 No. 15368.
 United States Court of Appeals District of Columbia Circuit.
 Argued April 25, 1960.
 Decided July 14, 1960.
 Petition for Intervenor Illinois Power Co. for Rehearing Denied September 3, 1960.
 
 Mr. Joseph W. McAuliffe, Battle Creek, Mich., of the bar of the Supreme Court of Michigan, pro hac vice, by special leave of court, with whom Mr. Thomas J. Lynch, Washington, D. C., was on the brief, for petitioner.
 Mr. Lloyd E. Dietrich, Atty., Federal Power Commission, of the bar of the Supreme Court of Virginia, pro hac vice, by special leave of court, with whom Messrs. Willard W. Gatchell, Gen. Counsel, Federal Power Commission, and Robert L. Russell, Asst. Gen. Counsel, Federal Power Commission, were on the brief, for respondent. Messrs. Howard E. Wahrenbrock, Solicitor, Federal Power Commission, Peter H. Schiff and David J. Bardin, Attys., Federal Power Commission, also entered appearances for respondent.
 
 
 1
 Mr. William C. Chanler, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. Lawrence A. Baker, New York City, was on the brief, for intervenors Consumers Power Company and Michigan Gas Storage Company.
 
 
 2
 Mr. Harry S. Littman, Washington, D. C., with whom Mr. Dale A. Wright was on the brief, for intervenor Trunkline Gas Company.
 
 
 3
 Mr. Thomas F. Ryan, Jr., Washington, D. C., for intervenor Michigan Gas Utilities Company.
 
 
 4
 Mr. Robert S. Hunt, Chicago, Ill., for intervenor Illinois Power Company.
 
 
 5
 Before Mr. Justice REED, retired,* and WASHINGTON** and DANAHER, Circuit Judges.
 
 
 6
 Mr. Justice REED, sitting by designation.
 
 
 7
 Petitioner seeks review under § 19(b) of the Natural Gas Act[1] of orders of the Federal Power Commission granting to the Trunkline Gas Company certificates of public convenience and related orders under § 7(c) of the Act.[2]
 
 
 8
 Trunkline operates an interstate pipeline bringing natural gas from the Texas-Gulf of Mexico production areas up the Mississippi River Valley to Tuscola, Illinois, where it joins the Panhandle-Eastern Pipeline system. Trunkline is a wholly-owned subsidiary of Panhandle, and all but a small quantity of its gas is sold to Panhandle at Tuscola to be resold to consumers through the Panhandle system.
 
 
 9
 The certificates involved here authorize Trunkline to expand its gas purchases in the Gulf of Mexico, to expand its pipeline capacity by increased pumping and partial looping of the pipeline, and to construct new lines from Tuscola to the Michigan-Indiana border near White Pigeon, Michigan, where 135,000 mcf per day of the increased gas supply will be sold to one customer, Consumers Power Co. and its storage affiliate, Michigan Gas Storage Company. Up to this time Consumers had purchased all its gas from the Panhandle system through Michigan Gas Storage Company.
 
 
 10
 Petitioner, Battle Creek Gas Co., is a local gas distribution company which also has purchased its gas from Panhandle. Battle Creek intervened in the § 7(c) certificate proceedings before the Commission to request an allocation of 4,000 mcf of gas per day during the five winter months of each heating season. Battle Creek's application contemplated that this gas would be delivered to it through Panhandle's facilities by use of Michigan Storage's and storage fields.
 
 
 11
 Intervenor Illinois Power Company also puchases its natural gas supply from Panhandle. It was granted leave to intervene in the proceeding before the Commission and we have granted it leave pursuant to Rule 38(f) of this court, 28 U.S.C., to intervene here. Illinois Power's interest is limited to the method by which the cost of the expansion being considered in this proceeding will be allocated to the rate base of Trunkline's customers, particularly Panhandle.
 
 
 12
 After a hearing the examiner denied Trunkline's basic application, finding it part of an effort by Panhandle to selectively allocate natural gas capacity among its customers at a time of critically short supply in such a way as to force hardpressed customers to accept expensive gas supplies and facilities.[3] Although he concluded that the applications should be denied, the examiner considered the other issues presented. He rejected Battle Creek's intervening application on the basis that it was not shown to be economically feasible.[4] The examiner also decided that the "rolled in" cost allocation method would be the appropriate way to allocate the cost of the expansion among Trunkline's customers.[5]
 
 
 13
 On exceptions from his decision the Commission reversed the examiner and granted the applications. The Commission rejected the examiner's conclusion that Trunkline-Panhandle were usurping the power to allocate their product among the customers. As evidence of the Commission's continued power in this area, it was noted that parties desiring an allocation from Trunkline's expanded capacity were free to intervene in the § 7 (c) proceedings. Two Panhandle customers, Battle Creek and Michigan Gas Utilities Co., did intervene for this purpose and the Michigan Gas Utilities application had been granted. The Commission accepted the examiner's findings and conclusions relating to the Battle Creek application and the cost allocation method. It is from this decision of the Commission and the denial of its application for rehearing that Battle Creek petitions for review here.
 
 
 14
 Two issues are presented by the petition. First, Battle Creek contends that the Commission's order permitting the expansion of facilities to serve only one customer is a discriminatory allocation of the increased capacity. As a corollary to this contention, Battle Creek argues that the Commission failed to exercise its statutory responsibility to allocate the expanded capacity among the customers of the Panhandle-Trunkline system. Battle Creek's second point is that the decision of the Commission applying the rolled-in cost allocation method put an unfair burden on petitioner and other customers who would thus be required to bear the cost of the expanded facilities but would receive no benefit from them.
 
 
 15
 During the pendency of this case here several applications for further expansion of the Trunkline and Panhandle facilities have been filed with the Commission.[6] The parties agree that these expanded facilities, if licensed by the Commission, will provide enough gas to meet all present requirements of the customers including Battle Creek. No hearings have been held as yet on these applications. Petitioner, because it is satisfied that the new applications eventually will be granted in some form, declined to press this aspect of the case on oral argument. Since petitioner is content with the relief alternatively available to it before the Commission, we deem it unnecessary at this stage of the proceedings to enter upon a consideration of the questions this issue would present. Rather, we dismiss this aspect of the appeal with the proviso that in the event the Federal Power Commission, in its disposition of the construction permits sought in Docket No. CP 60-22 and CP 60-60, does not afford petitioner what it has sought, petitioner may apply to this court to reopen this issue in the case.
 
 
 16
 We turn to the remaining issue, the accounting method to be used in reflecting the cost of the new facilities in the rates of the customers. Trunkline's application contemplated a price for the new gas to be sold to Consumers adequate to cover on an incremental basis the entire cost of the expansion project, including the new gas supplied, the new gathering lines, the partial looping of Trunkline's main transmission line,[7] an additional compressor at Tuscola, and the additional pipeline up to the Michigan-Indiana border. By this method, Consumers and Consumers' customers would bear the entire cost of this expansion program. At the hearing, the Commission's staff opposed this incremental cost method and in its place submitted to the examiner four alternative methods. The examiner adopted the staff's method No. 1, providing that all the costs of the expansion program up to Tuscola be "rolled-in" with the other system-wide costs of Trunkline and be included in the cost basis considered in fixing the rates of all of Trunkline's customers. Under this method the costs of the pipeline from Tuscola to the Michigan-Indiana border would still be treated as incremental costs and charged directly and solely to Consumers. On review, the Commission adopted the examiner's decision.
 
 
 17
 There is agreement as to the basic principles of rate-making involved in this case. The parties do not raise any issues as to the arithmetical computation of the allocations by the Commission. Rather the dispute centers on the method by which the costs of this particular expansion program will be allocated for ratemaking purposes.
 
 
 18
 The role of reviewing courts in passing on the rate-making methods used by administrative agencies is necessarily narrow.[8] These matters are properly for the Commission, and its determination is to be disturbed for only the most basic forms of abuse.
 
 
 19
 At the risk of oversimplification in this subtle and highly technical area, we think the essential problem can be shortly set out. There are two basic and potentially divergent methods of allocating new asset costs to be reflected in a utility's rate structure. The first recognizes that a gas pipeline of this sort is not just a collection of discrete pieces and parts, but an integrated system serving all of its customers. Applying this approach the cost of the various assets of the system are collected or "rolled in" to arrive at cost of the entire system which is then pro-rated among all of the customers by one of several rate-making mechanisms not here involved.
 
 
 20
 This method has many apparent advantages and the Commission has repeatedly stated a general preference for it wherever it may equitably be used.[9] It avoids the onerous administrative burden of having to assign a different portion of the cost to each of a large number of customers.[10] It results, if all other factors be equal, in all customers paying the same price for gas taken from the pipeline at the same point, and recognizes that all customers enjoy the benefits of having the whole gas gathering and pipeline system.
 
 
 21
 The rolled-in rate method is generally disadvantageous, however, to old customers of an expanding pipeline. The cost of new facilities and new gas historically has risen steadily, and a rolled-in rate requires old customers to pay a higher price and bear part of the cost of an expansion from which they receive little visible increase in service.[11] But, conversely, use of the rolled-in approach ensures that two otherwise similar customers will not pay radically different prices for commingled gas coming from the same pipe, merely because one happens to have been receiving the service longer than the other. Use of the rolled-in method thus serves the interest of equal treatment for customers receiving equal service.
 
 
 22
 Whatever its virtues, use of a "rolled-in" approach alone is not adequate in all situations, particularly where some assets are used by the utility solely for the benefit of one customer. At some point in every gas distribution facility the general system ends and connective links to the local distributors' own equipment begins. At this point the facility becomes so identified with its function as a part of the local distributor's gas plant that it may be unfair to charge its costs to all of the customers of the utility. This is particularly so where the extent and cost of such segregated facilities vary greatly among the customers. In such a situation the costs of these facilities are commonly charged as an "incremental" cost added in to the particular customer's rate base.[12] Whether the cost of a particular facility is more properly treated as a systemic cost and rolled-in to the rate base of all of the customers, or as a segregated cost to a particular customer, which should be treated on an incremental basis, is frequently a difficult issue of fact presented to the Commission.
 
 
 23
 In this case the examiner and the Commission, with one Commissioner dissenting,[13] reached the conclusion that the costs of the expansion program representing the purchase of new gas and the improvement of the line up to Tuscola, Illinois, should be rolled in as a systemic cost while the costs of the pipeline from Tuscola to Consumer's facilities on the Michigan-Indiana border should be charged solely to Consumers as an incremental cost.[14]
 
 
 24
 The Commissioner's decision was based on what we believe to be the proper conclusion that the expanded facilities will form part of an integrated Trunkline system and that the expansion will benefit the entire system. The new gas is to be commingled with the old gas, and both are to be distributed together to all customers. For the first two years after the expansion, before Consumer's will be able to utilize the entire new capacity, some gas would be available to other customers from the new fields. Most importantly, the conclusion that these facilities will be integrated with the Trunkline system is supported by the character of the expansion as the first step in an overall expansion program, eventually designed to meet all of the requirements of all of Trunkline's customers. The facilities involved in these applications will provide "cheap expansibility" to Trunkline, permitting future expansions to be made by relatively inexpensive increases in pumping facilities and partial looping at a fraction of what the further expanded capacity would otherwise cost. This partial expansion also opens up new gas reserves and new producing areas to meet the needs of Trunkline's customers.
 
 
 25
 We find that the Commission's basic conclusion that this partial expansion would be part of the integrated gas system was proper, and therefore affirm the use of the rolled-in allocation method. This conclusion is confirmed by, although it is not dependent upon, the later applications of Trunkline, clearly indicating an intent to utilize for the benefit of all customers the "cheap expansibility" and new reserves made available through the facilities involved in this application.
 
 
 26
 Commissioner Kline limited his dissent to that part of the Commission's decision rolling-in the costs of newly purchased gas before a general expansion program was instituted for the direct benefit of all Trunkline's customers. In the dissenting Commissioner's view, until these new sources of supply are used for the direct benefit of all customers their high cost should be charged only to Consumers who alone will receive the direct benefit of the greater capacity of the system.
 
 
 27
 We also affirm the Commission's decision to roll-in the new facilities and gas supplies immediately rather than when the full expansion program is completed. As we have noted, the new gas will be fed directly into the existing pipeline and commingled with the other gas delivered to all the customers along the pipeline. Furthermore, it is now abundantly clear that the increased capacity made possible by these new gas supplies will be made available to all customers as soon as the necessary improvements can be approved and constructed. We think, in these circumstances, there is sufficient basis for the Commission's conclusion that from the time they are put into service these facilities and supplies will inure to the benefit of the system at large.
 
 
 28
 We need not pass upon the desirability of the method by which this expansion program has been effectuated, and we do not do so. We cannot say that the Commission's action in disregarding the possible inequalities of this piecemeal expansion in fixing the time at which the cost of the program is to be rolled-in to the systemic rate base is so unreasonable as to require reversal of the Commission on this ground.
 
 
 29
 The orders of the Commission are affirmed in full, subject to reopening at a future date in conformity with this opinion.
 
 
 30
 It is so ordered.
 
 
 
 Notes:
 
 
 *
 Sitting by designation pursuant to Sec. 294(a), Title 28 U.S.Code
 
 
 **
 Circuit Judge Washington, who heard the argument, took no part in the consideration and decision of the case
 
 
 [1]
 52 Stat. 831, 15 U.S.C.A. § 717r(b)
 
 
 [2]
 Trunkline Gas Co., et al., 21 F.P.C. 704 (1959)
 
 
 [3]
 21 F.P.C. 727, 735-36:
 "In view of the complete control which Panhandle exercises over Trunkline, it is apparent that the Trunkline's actions in this case are determined by, and fully accord with, the desires and wishes of Panhandle. Furthermore, the evidence in this proceeding has shown clearly that the systems of Trunkline and Panhandle are in fact completely coordinated and operated as one integrated natural gas system. However, for unexplained reasons, Panhandle failed to intervene in this proceeding (as it has done in others affecting Trunkline) and thereby foreclosed any opportunity on the part of counsel for the Commission and the intervenors to inquire into Panhandle's future plans for Trunkline and also the failure of Panhandle in the past to adequately provide natural gas service to its customers, which failure is well known, particularly to Panhandle's customers. * * *
 "The record is lacking in any explanation as to why Panhandle did not cause Trunkline at this time to seek authority to completely loop, or to extend its looping program beyond what is here proposed, in order to provide not only for the needs of Consumers but also the present needs of other customers of Trunkline and Panhandle whose needs are as pressing as those of Consumers.
 * * * * *
 "Trunkline's partial looping program here being carried out under Panhandle's guidance for service to a single customer is to be contrasted with the annual construction programs adhered to by other pipelines for service to all customers — both old and new — under uniform or equitable rates. Here Trunkline and Panhandle, instead of currently providing for the needs of their customers have delayed adequate service to Consumers until Consumers' plight has progressed to the point that it feels that it has no alternative but to agree to accept their brand of rate making and the high field prices of producer-applicants for gas to obtain additional service that should have, and apparently by timely action on the part of either or both Panhandle and Trunkline could have, been supplied over the past years of short supply — when field prices for gas and costs of construction and operation were considerably lower than now."
 
 
 [4]
 21 F.P.C. at 760-61
 
 
 [5]
 Id., at 739-46
 
 
 [6]
 These applications are Commission Docket No. CP 60-22, filed February 2, 1960, and Commission Docket No. CP 60-60, filed March 14, 1960. We do not consider ourselves foreclosed from taking notice of these applications filed after the close of the Commission's record where they are relevant to the issues before us. See City of Pittsburgh v. Federal Power Commission, 1956, 99 U.S. App.D.C. 113, 124, 237 F.2d 741, 752
 
 
 [7]
 The term "looping" is understood to mean the construction of a second pipeline parallel to the original line, thus increasing the carrying capacity of that part of the line. Partial looping is a method of pipeline expansion in which the parallel pipe is installed along only part of the line
 
 
 [8]
 See Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 585-586, 62 S.Ct. 736, 86 L.Ed. 1037; Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 600-603, and dissenting opinions at pages 620-623, 625-628, 645, 652-653, 64 S.Ct. 281, 286-288, and dissenting opinions at pages 296-297, 298-300, 308, 311-312, 88 L.Ed. 333, dissenting opinions; Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 589-590, 604-605, 65 S.Ct. 829, 89 L.Ed. 1206
 
 
 [9]
 See e. g. Colorado Interstate Gas Co., 19 F.P.C. 1012, 1021 (1958); United Gas Pipe Line Co., 14 F.P.C. 353, 391-400 (1955); Colorado Interstate Gas Co., 11 F.P.C. 324, 353-54 (1952); Trunkline Gas Supply Co., 8 F.P.C. 250, 258 (1949); cf. Louisiana P.S.C. v. United Gas Pipe Line Co., 3 F.P.C. 402, 404-405 (1943); City of Cleveland v. Hope Natural Gas Co., 3 F.P.C. 150, 190 (1942)
 
 
 [10]
 See United Gas Pipe Line Co., 14 F.P.C. 353, 395 (1955)
 
 
 [11]
 For an able exposition of this viewpoint see the dissenting opinion of Commissioner Draper, Trunkline Gas Supply Co., 8 F.P.C. 250, 260 (1949)
 
 
 [12]
 See e. g. The Montana Power Co., 11 F.P.C. 1 (1952). In that case additional gas supplies were obtained in Canada and pipelines were constructed to meet the requirements of one customer. Although the new facilities fed into the existing distribution system and the new and old gas was commingled, the Commission found it proper to charge all the costs on an incremental basis to the one customer. This conclusion can be justified, since under the terms of the act of the Legislative Assembly of the Province of Alberta under which the gas was to be exported from Canada, and under the terms of the F.P.C. license under which it was to be imported into the United States, the amount of gas to be removed was explicitly limited to the amount necessary to enable the Montana Gas. Co. to meet the needs of the one customer. 11 F.P.C. at 2, 8-9
 
 
 [13]
 Commissioner Kline dissented. 21 F.P.C. at 726. Commissioner Connole dissented as to aspects of the decision not involved in this petition for review. 21 F.P.C. at 721. Commissioner Hussey did not participate in the proceedings before the Commission
 
 
 [14]
 21 F.P.C. 710-12