"COMPLEX" CONSOLIDATED EDISON
COMPANY OF NEW YORK, INC.,
et al., Petitioners,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

Northern Illinois Gas Company,
et al., Intervenors.

Nos. 97–1554, 97–1560, 97–
1580 and 97–1590.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 23, 1998.

Decided Feb. 12, 1999.

Lee A. Alexander argued the cause for petitioners JMC Power Projects and New England Power Company. With him on the briefs were Stefan M. Krantz and Mitchell F. Hertz. Yoav K. Gery entered an appearance.

Gary E. Guy argued the cause and filed the briefs for petitioner Equitable Gas Company.

Harvey L. Reiter argued the cause for petitioners Consolidated Edison Company of New York, Inc., et al. With him on the briefs was Kenneth T. Maloney. Marc Richter entered an appearance.

Timm L. Abendroth, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were Jay L. Witkin, Solicitor, and Susan J. Court, Special Counsel.

Jonathan D. Schneider argued the cause for intervenor New York State Electric and Gas Corporation. Kevin J. McKeon argued the cause for intervenor Connecticut Natural Gas Corporation. With them on the brief were Richard M. Lorenzo, Gary E. Guy, David I. Bloom, Scott P. Klurfeld, David D'Alessandro, Tom Rattray, Barbara K. Heffernan, Roy R. Robertson, Jr., Nancy A. White, Elizabeth Ward Whittle and Kevin M. Sweeney. Lillian S. Harris and Bruce A. Connell entered appearances.

Jeffrey D. Komarow argued the cause for intervenors Tennessee Gas Pipeline Company and Bay State Gas Company, et al. With him on the brief were Robert H. Benna, Barbara K. Heffernan and Tom Rattray. Michael J. Fremuth entered an appearance.

Before: WALD, RANDOLPH and ROGERS, Circuit Judges.

Opinion for the Court filed PER CURIAM.

PER CURIAM:

Tennessee Gas Pipeline Company ("Tennessee") owns and operates a "long-line" interstate natural gas pipeline system running from the Texas gulf coast to New Hampshire. In 1991, Tennessee made a general rate filing pursuant to section 4 of the Natural Gas Act. 15 U.S.C. § 717c (1994). A number of Tennessee's customers brought challenges. Most issues were resolved at various points in the ensuing rate proceedings, with the exception of those raised by the petitioners here. Petitioners now seek review of several rulings issued by the Federal Energy Regulatory Commission ("FERC" or the "Commission"). *See Tennessee Gas Pipeline Co.*, 76 F.E.R.C. ¶ 61,022 (1996) ("Opinion 406") ("*Tennessee II*"), *reh'g denied, Tennessee Gas Pipeline Co.*, 80 F.E.R.C. ¶ 61,389 (1997) ("Opinion 406–A") ("*Tennessee III*"). For the reasons set forth in Parts I, II, and III, we deny each of the petitions for review.[1]

## PART I: THE NET/T–180 FACILITIES

JMC Power Projects and the New England Power Company (jointly "JMC Power") petition for review of several FERC rulings, in the relevant portions of which the Commission approved a Tennessee proposal to continue recovering the costs of a series of facility expansions, collectively referred to as the NET/T–180 facilities, on an incremental basis.[2] Petitioners claim that, in accepting the proposed incremental rate treatment, FERC unjustifiably departed from both its own precedent and prior decisions of this court, and unlawfully utilized quantitative measures in assessing the potential costs and benefits of the expansion facilities to preexisting customers. We conclude that Opinions 406 and 406–A clearly clarified the Commission's historic test for determining the propriety of rolled-in versus incremental pricing of expansion facilities' costs, and that FERC provided a reasoned explanation for a modest shift from its strictly two-tiered *Battle Creek* test[3] towards a standard that examines additional relevant factors. Because

1. Part I, written by Judge Wald, discusses the NET/T–180 facilities. Part II, written by Judge Randolph, discusses the FSST/T–149 and Boundary facilities, as well as the Niagara Spur Charge. Part III, written by Judge Rogers, discusses the Uniform Hourly Take Tariff. The factual background and procedural history relevant to each of the petitioners' challenges are discussed within the respective parts.

2. "Incremental" pricing refers to a cost-recovery method in which the constructing pipeline develops a separate cost of service for the expansion facilities, recapturing the construction cost solely from the particular customers who utilize them. *See TransCanada PipeLines Ltd. v. FERC*, 24 F.3d 305, 307 n. 1 (D.C.Cir.1994). Under "rolled-in" pricing, the primary alternative to incremental treatment, the pipeline adds the costs of the expansion facilities to its total rate base, recovering its expenditures by increasing the general rate that all customers pay in proportion to their reservation of capacity or direct usage. *See Algonquin Gas Transmission Co. v. FERC*, 948 F.2d 1305, 1308 & n. 1 (D.C.Cir.1991).

3. In *Battle Creek Co. v. FPC*, 281 F.2d 42 (D.C.Cir.1960), this court first gave its approval to the prevailing Federal Power Commission ("FPC") policy with respect to the pricing of expansion facilities. *See Southeastern Michigan Gas Co. v. FERC*, 133 F.3d 34, 37 (D.C.Cir.1998). Under the so-called *Battle Creek* test, the costs affiliated with expansion facilities can properly be rolled into the general system rates whenever such facilities are integrated with the pipeline system and provide system-wide benefits.

FERC supplied a sufficient explication for this clarification which, as intended, brought FERC policy into accord with this court's Natural Gas Act jurisprudence, we deny JMC Power's petition for review.

## A. Background

Between 1988 and 1992, FERC approved the construction of seven separate projects (collectively the "NET/T–180 facilities")[4] by Tennessee, whose costs were initially to be recovered through incremental pricing.[5] In its 1991 general rate filing pursuant to section 4 of the Natural Gas Act ("NGA"), 15 U.S.C. § 717c,[6] Tennessee proposed to continue the existing incremental pricing of the NET/T–180 facilities.[7] FERC accepted the rate filing subject to refund, and set the matter for evidentiary hearing before an Administrative Law Judge ("ALJ"). Tennessee and its customers later reached an agree-

ment settling most of the contested issues, which FERC then approved on October 29, 1993. See Tennessee Gas Pipeline Co., 65 F.E.R.C. ¶ 61,142. The remaining issues were assigned to the ALJ.

In the ensuing series of evidentiary hearings, JMC Power sought rolled-in treatment for the NET/T–180 facilities by arguing that the facilities were fully integrated into the Tennessee pipeline system and provided various operational and financial benefits to Tennessee and its pre-expansion customers. In particular, its primary witness testified that, in his estimation, the NET/T–180 facilities produced between $28.85 and $79.45 million in total levelized annual benefits[8] to pre-existing Tennessee customers, with a mid-case value of $46.53 million. He also asserted that the annual levelized costs of rolled-in treatment would amount to $22.73 million.

---

4. Serving various customers in Zones 5 and 6 of the Tennessee pipeline, the NET/T–180 facilities are as follows. (1) The Ocean State Power Project, which provides service to a new electric generation facility, consists of roughly 14.3 miles of 30–inch mainline looping, 10.7 miles of 20–inch pipeline extension, and three new compressors. Its rate schedule was designated T–180. (2) The Niagara Import project phase II, which provides transportation service to four new customers, includes approximately 30.3 miles of 30–inch pipeline looping, 31.4 miles of 30–inch looping along the Niagara Spur, and two new compressors in New York and Massachusetts. (3) The Niagara Import project phase III, which provides transportation service to three additional customers, includes a percentage of a half mile 30–inch loop crossing the Niagara River, a percentage of 17.3 miles of mainline looping and two new compressors along the Niagara Spur, and roughly 24.4 miles of mainline looping in New York and Massachusetts. (4) The NET–Northeast project encompasses a part of both the Iroquois Gas Transmission System ("Iroquois") Phase I and Phase II expansions. (5) Iroquois Phase I provides service to twelve customers located in Massachusetts, Rhode Island, Connecticut, and New Hampshire. It includes approximately 62.8 miles of mainline looping and pipeline replacement. (6) Iroquois Phase II provides service to three customers, along with 27.13 miles of mainline looping and replacement laterals in Massachusetts, and an additional 9350 horsepower of compression at three stations situated in Massachusetts and New York. (7) The NET–Elgin project serves four customers through 29.33 miles of 30–inch and 36–inch mainline looping and 3100 additional horsepower of compression at two New York stations. See Tennessee I, 76 F.E.R.C. at 61,108–09.

5. Although the projects were priced individually at the time of their respective certification, in 1992 FERC accepted a partial settlement through which Tennessee's different NET rate schedules were consolidated into a single incremental rate schedule. See Tennessee Gas Pipeline Co., 63 F.E.R.C. ¶ 61,095 (1992).

6. Section 4(e) of the NGA provides that "[a]t any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate is just and reasonable shall be upon the natural-gas company...." 15 U.S.C. § 717c(e).

7. Tennessee had made a limited section 4 filing in Docket No. RP92–132–000, solely addressing its NET–EU and T–180 Rate Schedules. FERC consolidated this docket with Tennessee's general section 4 rate filing in Docket No. RP91–203–000, the filing which gave rise to this case. See Tennessee Gas Pipeline Co., 58 F.E.R.C. ¶ 61,343 (1992).

8. Levelization refers to a process in which the costs of a one-time capital expenditure or a lump-sum benefit are converted into a constant annual cash flow so as to provide a consistent basis from which to compare average annual costs and benefits. The annual levelized cost refers to that amount which, if collected for each year of the project's life, would yield the same present value of revenue requirements as is yielded under traditional rate-making. The JMC Power witness utilized levelized estimates so as to avoid the distorting effects caused by straight-line depreciation, which does not differentiate between present and future value.

*See Tennessee Gas Pipeline Co.*, 72 F.E.R.C. ¶ 63,005, at 65,077 (1995) (*"Tennessee I"*). A number of Tennessee's preexisting customers challenged these claims, questioning the existence of each alleged benefit, as well as the statistical models upon which JMC Power had assessed their value. According to the ALJ's initial decision, the weight of the evidence favored the conclusion that the NET/T–180 facilities provided neither operational benefits nor additional reliability to Tennessee's system customers. In addition, the ALJ found that rolling-in the costs of the NET/T–180 facilities to Tennessee's general rate base would cause a rate increase for pre-expansion customers in excess of 5%. *See id.* at 65,084–86. On the basis of these findings, he concluded that both the *Battle Creek* test and FERC's Pricing Policy Statement[9] mandated incremental pricing. Accordingly, he approved the Tennessee proposal to continue the existing incremental treatment. *See id.* at 65,086.

JMC Power filed exceptions to the ALJ's initial decision with the Commission, alleging that the judge had misinterpreted both FERC and D.C. Circuit precedent, and had misapplied the *Battle Creek* test in assessing the proper pricing scheme for the NET/T–180 facilities. JMC Power further contended that the ALJ had misconstrued the evidence before him, as the testimony presented (in JMC Power's view) fully established that the NET/T–180 facilities were both integrated into the Tennessee pipeline and provided significant benefits to pre-existing customers. These alleged benefits included: increased interruptible service; increased peak capacity due to both nonsynchronous demand and the fuel switching capabilities of the primary NET/T–180 customers; avoided facilities costs for future expansions; the encouragement of price competition through increased access to Canadian gas suppliers; fuel savings stemming from the greater efficiency of the new compressors; contribution to Tennessee's take-or-pay costs through the payment of the volumetric surcharge established by the Cosmic Settlement;[10] potential contributions to stranded investment and new facilities costs; potential contributions to gas supply realignment ("GSR") costs; and general environmental and national security benefits. Finally, JMC Power claimed that the ALJ had miscalculated the rate impact of rolling-in the contested facilities; according to JMC Power's calculations, rolled-in treatment would only result in a 4.9% rate increase, below the 5% presumption established in the Pricing Policy Statement. The parties who had presented contrary evidence before the ALJ filed briefs opposing JMC Power's exceptions.

9. In 1995, FERC issued a *Pricing Policy for New and Existing Facilities Constructed by Interstate Natural Gas Pipeline*, 71 F.E.R.C. ¶ 61,241 (1995), *reh'g denied*, 75 F.E.R.C. ¶ 61,105 (1996) ("Pricing Policy Statement"), which clarified its policy with respect to the pricing of expansion facilities. The Commission solicited comments on that subject in Docket No. PL94–4–000, receiving written submissions from seventy-five companies and groups and hearing oral comments from others through a public hearing. Concerned that the use of rolled-in pricing could force existing customers to pay substantially higher prices without receiving proportionate system-wide benefits, and that the lack of price certainty negatively impacted customers with long-term service contracts, FERC announced a new policy designed to minimize significant rate shocks and to provide greater cost certainty prior to the construction of new facilities. The Pricing Policy Statement sought to achieve these goals by making a determination as to the appropriate rate design at the certificate stage, at which time FERC would assess the system-wide benefits of a project as well as its rate impact on existing customers. To the extent that rolled-in pricing would increase the rates of existing customers by 5% or less, and its proponents had made a showing of system benefits with "reasonable particularity," *see* 71 F.E.R.C. at 61,916, FERC would presume that the expansion costs should be rolled-in. Opponents of rolled-in pricing could rebut this presumption by establishing that the benefits of the expansion facilities were so insignificant that rolled-in pricing would be unreasonable. *See id.* at 61,916–17. To the extent that rolled-in pricing would cause a rate increase of more than 5%, the Pricing Policy Statement created a rebuttable presumption in favor of incremental treatment. Opponents could overcome this presumption through showing that the resulting system benefits were sufficient to support rolled-in treatment. *See id.*

10. The "Cosmic Settlement" refers to an agreement that resolved a significant number of Tennessee cases pending before FERC. *See Tennessee Gas Pipeline Co.*, 57 F.E.R.C. ¶ 61,360 (1991), *order on reh'g approving settlement as modified*, 59 F.E.R.C. ¶ 61,045 (1992).

In Opinion 406, the Commission agreed with the ALJ's decision to order incremental pricing for the NET/T–180 facilities. The Commission found the alleged system benefits postulated by JMC Power to be insubstantial; in each case, the purported benefits flowed almost entirely to the shippers for whom the NET/T–180 facilities were constructed. Because of the high load factor[11] of these shippers—roughly 85–90%—FERC concluded that they likely made substantial purchases of Canadian gas, thereby leaving little capacity available for other pre-existing shippers and limiting the availability of interruptible transportation.[12] *See Tennessee II,* 76 F.E.R.C. at 61,112. Moreover, FERC reasoned, a capacity bottleneck at Station 219 prevented upstream shippers from utilizing the NET/T–180 facilities, calling into question any additional access to Canadian gas supplies. *See id.* at 61,112–13. The alleged benefits of cheaper future expansions and declining fuel costs were deemed purely speculative, as were the payment of GSR costs in the event of future conversions to open-access transportation, and the alleged environmental and national security benefits.[13] *See id.* at 61,113–14. Finally, the Commission noted that JMC Power had manipulated its estimation of the rate increase that would accompany rolled-in treatment by illegitimately adding the costs of the FSST, Niagara Spur, and the Boundary facilities

into the figure it used for the pre-expansion rate base. *See id.* at 61,114 n. 144.

Departing from the ALJ's reasoning to some extent, FERC based its final determination on the grounds that JMC Power had failed to provide sufficient evidence for the Commission to find, under section 5 of the NGA,[14] not only that rolled-in treatment itself would be just and reasonable, but also that the pipeline's proposed continuation of the existing incremental treatment would be unjust and unreasonable. Since the NGA delegates the primary initiative to propose transportation rates to the pipelines, *see United Gas Pipe Line Co. v. Mobile Gas Service Corp.,* 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); *ANR Pipeline Co. v. FERC,* 771 F.2d 507, 513 (D.C.Cir.1985), FERC distinguished its treatment of the FSST/T–149 and Boundary facilities, *see* discussion *infra* Part II, on the grounds that Tennessee had proposed to roll-in their facilities costs. *See Tennessee II,* 76 F.E.R.C. at 61,115. By contrast, as Tennessee had proposed to continue the existing incremental treatment of the NET/T–180 facilities in this section 4 proceeding, FERC could only have ordered rolled-in treatment by acting under section 5 of the NGA. *See Algonquin Gas Transmission Co. v. FERC,* 948 F.2d 1305, 1311 (D.C.Cir.1991). Accordingly, it reviewed JMC Power's exceptions by asking

**11.** The term "load factor" refers to the ratio of a shipper's average hourly use over its maximum hourly use. Customers who need a constant supply of natural gas—*e.g.,* industrial customers—will have high load factors, while those whose needs vary throughout the day—*e.g.,* residential suppliers—will generally have lower load factors.

**12.** Interruptible service "provides gas on a 'when available' basis and may be interrupted after notice to the subscriber." *Algonquin,* 948 F.2d at 1309 n. 5.

**13.** FERC reasoned that the environmental and national security benefits proffered by JMC Power raised the type of general social benefits which the Pricing Policy Statement had deemed improper for consideration because they "are difficult to substantiate and quantify." *Id.* at 61,114 n. 143 (quoting *Pricing Policy Statement,* 71 F.E.R.C. at 61,196). FERC also noted the ALJ's finding, based upon the record before him, that such benefits were merely speculative, and that they were unrelated to the operation of a gas

pipeline. Finally, the Commission stated that it was not "aware of any cases decided under *Battle Creek* in which such general social benefits were relied on to support rolled-in rates." *Id.*

**14.** Section 5(a) of the NGA provides that:

Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge or classification demanded, observed, charged, or collected by a natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule regulation, practice or contract to be thereafter observed and in force, and shall fix the same by order....

15 U.S.C. § 717d(a).

whether, as the proponent of rolled-in treatment, JMC Power had offered evidence sufficient to justify the statutory burden FERC would face were it to act under section 5 to order rolled-in treatment.[15] The Commission analogized the present case to the *Algonquin* proceedings, in which this court had remanded the Commission's decision to set aside the proposed incremental treatment, and to order rolled-in rates, on the grounds that it had failed to produce substantial evidence to satisfy its section 5 burden. On the record before it, FERC held that JMC Power had similarly failed to establish that the proposed incremental treatment would be unjust or unreasonable.

In Opinion 406–A, FERC denied JMC Power's request for rehearing and further elaborated its decision denying rolled-in treatment for the NET/T–180 facilities cost.[16] Focusing upon JMC Power's assertion that it had provided substantial evidence to support its contention that rolled-in pricing would be just and reasonable, FERC ruled that, even if true, JMC Power had nevertheless failed to make the necessary prior showing that the proposed incremental rates were unjust and unreasonable. The Commission acknowledged that it had previously considered the satisfaction of *Battle Creek*—a showing of integration and system-wide benefits—sufficient to support a finding both that rolled-in

treatment is just and reasonable *and* that incremental pricing is unjust and unreasonable. However, FERC went on to note, this court's *Algonquin* and *TransCanada Pipe-Lines Ltd. v. FERC*, 24 F.3d 305 (D.C.Cir. 1994), decisions had overturned its previous two rate-setting actions under NGA section 5. In its view, "a contributing factor" to these decisions reversing the agency's price setting action "has been an improper blurring of the distinction between NGA sections 4 and 5." *Tennessee III*, 80 F.E.R.C. at 61,223.

In what it described as a refinement of the Commission's past practices under section 5 of the NGA, taken in light of this court's repeated admonitions to respect the boundaries that separate section 4 from section 5 rate-settings, FERC reiterated its premise that there is no single just and reasonable rate. *See id.* at 61,223–24 & n. 106 (citing *Western Resources, Inc. v. FERC*, 9 F.3d 1568, 1578 (D.C.Cir.1993); *Northwest Pipeline Corp.*, 71 F.E.R.C. ¶ 61,012 at 61,042 (1995)). The mere fact that rolled-in treatment may be just and reasonable under *Battle Creek*, FERC continued, does not establish that incremental treatment is necessarily unjust and unreasonable. "There is not a single magic point on the continuum between incremental and rolled-in rates such that at

---

**15.** In order to act under section 5, FERC would have been required to show that the existing incremental pricing was unjust and unreasonable. Implicitly, then, FERC asked whether JMC Power had satisfied the standard that FERC itself would have had to meet were it to reject the proposed incremental pricing and to order rolled-in pricing. Since FERC supported the incremental treatment proposed by Tennessee in its section 4 rate filing, and found it to be just and reasonable, it shifted the statutory burden of section 5 onto the shoulders of JMC Power when assessing the argument for rolling-in the NET/T–180 facilities cost. Although this burden would have been FERC's had it formulated and ordered its own rate, FERC discussed the matter in terms of whether JMC Power had provided sufficient evidence to satisfy the section 5 burden. We shall do the same.

**16.** The Commission first rejected an offer by 68% of the NET/T–180 shippers to convert to open-access transportation service under Part 284 of the Commission's regulations, conditional upon FERC's acceptance of rolled-in treatment. Since the conversion offer constituted a new proposal, and one opposed by Tennessee, FERC could only

accept the offer if it had satisfied section 5 of the NGA. As superceding settlements in Docket No. RP93–151–024, *et al.*, *Tennessee Gas Pipeline Co.*, 79 F.E.R.C. ¶ 61,031 (1997), had fixed Tennessee's GSR surcharge for existing customers, the proposed shift to Part 284 service by some of the NET/T–180 shippers would not have reduced the GSR costs borne by the pre-expansion customers in the near future. *See Tennessee III*, 80 F.E.R.C. at 61,219–21. Moreover, FERC noted that conversion to Part 284 service would have shifted the rate at which the NET/T–180 facilities were depreciated from the existing 5% level to the standard system rate of 2.5%. Such a shift would have reduced the return on equity associated with the NET/T–180 facilities, decreasing the level of revenues collected by Tennessee without providing any opportunity for it to offset these losses. *See id.* at 61,221–22 & n. 97. After taking the altered depreciation rate into account, FERC found that the rate impact of rolled-in treatment would still exceed the 5% threshold utilized in the Pricing Policy Statement. *See supra* n. 9.

that single point an incremental rate becomes unjust and unreasonable while a rolled-in rate simultaneously becomes just and reasonable." *Tennessee III*, 80 F.E.R.C. at 61,224. The Commission then went on to explain that its references in Opinion 406 to the fact that the benefits of the NET/T–180 facilities primarily inure to the NET/T–180 shippers served to illustrate that the proposed incremental pricing was not unjust and unreasonable. Because the facilities provided a greater and more direct benefit to the expansion shippers than to Tennessee's pre-existing customers, the postulated system benefits of increased reliability, improved flexibility, and reduction of costs were insufficiently material. This determination, coupled with the fact that rolled-in treatment would entail a substantial cost-shifting to pre-expansion customers, led the Commission to reaffirm its earlier conclusion that incremental treatment was neither unjust nor unreasonable. Accordingly, the Commission had properly approved the proposed section 4 rate filing in Opinion 406.

In this petition for review, JMC Power challenges the Commission's decisions on three separate but interrelated grounds. First, it alleges that FERC unjustifiably departed from *Battle Creek*, and that it did so in contravention of—rather than, as FERC maintains, in accordance with—this court's *Algonquin* and *TransCanada* decisions. Second, JMC Power contends that FERC unlawfully applied a "strict quantitative" standard in assessing the costs and benefits of rolled-in treatment, and that it fully satisfied the qualitative *Battle Creek* standard that should have been utilized. Finally, JMC Power asserts that the Commission improperly departed from its own *Great Lakes Gas Transmission, L.P.*, 72 F.E.R.C. ¶ 61,081 (1995) ("*Great Lakes I*") precedent, wherein it ordered rolled-in pricing on the grounds that Great Lakes Gas Transmission, L.P. ("Great Lakes") had legitimately relied upon the continued application of *Battle Creek* at the time its expansion facilities were certificated and then constructed. JMC Power maintains that it too relied upon the future application of *Battle Creek*, and that the pricing of the NET/T–180 facilities should be determined solely on the basis of that stan-

dard. We disagree with all three of JMC Power's contentions, and hold that FERC provided sufficient explication for its refinement of the *Battle Creek* test, and that the multi-factored elaboration accords with both our supervening jurisprudence and common sense.

### B. *Discussion*

#### 1. *NGA Section 5 and Rolled-in Versus Incremental Pricing*

■ In *Battle Creek Gas Company v. Federal Power Commission*, 281 F.2d 42 (D.C.Cir.1960), this court distilled from FPC precedents a two-prong test for determining whether the costs of expansion facilities were properly recovered through incremental or rolled-in pricing. Under what has become known as the *Battle Creek* test, the Commission asks: (i) whether the expansion facilities form part of an integrated system that functions as a single unit in serving pre-existing and expansion customers alike; and (ii) whether the expansion facilities provide system benefits that accrue generally to all those who utilize the pipeline. *See id.* at 47. Rolled-in pricing is only appropriate in those instances where expansion facilities are integrated and provide system-wide benefits.

The *Battle Creek* test has proven more contentious in its application than this seemingly straightforward articulation might imply. In particular, when the question of its proper application has intersected with the disparate burdens that distinguish agency action under section 4 from that under section 5 of the NGA, as it does in this case, both the Commission and the courts have had a difficult time reconciling countervailing impulses. In Opinions 406 and 406–A, the Commission sought to impose a degree of conceptual order upon rate-setting at this point of overlap. Taken together, they offer a reasoned reconciliation of the pipeline's role as the primary initiator of price setting with FERC's statutory duty to ensure that proposed rates are just, reasonable, and nondiscriminatory.

#### a. *Section 5 in Court*

■ This court reviews rate-setting deferentially; our scrutiny is limited to ensuring

that the Commission has made a principled and reasoned decision supported by the evidentiary record. *See Columbia Gas Transmission Corp. v. FERC,* 628 F.2d 578, 593 (D.C.Cir.1979). Nevertheless, this court has strictly policed the statutory line that separates action taken under NGA section 4 from that taken under NGA section 5. In *Algonquin,* we described this distinction as follows:

> [T]he Commission may act under two different sections of the Natural Gas Act (NGA or the Act) to effect a change in a gas company's rates. When the Commission reviews rate increases that a gas company has proposed, it is subject to the requirements of section 4(e) of the Act, 15 U.S.C. § 717c(e). Under section 4(e), the gas company bears the burden of proving that its proposed rates are reasonable. On the other hand, when the Commission seeks to impose its own rate determinations, rather than accepting or rejecting a change proposed by the gas company, it must do so in compliance with section 5(a) of the NGA.

948 F.2d at 1311. Under section 5, the Commission must first establish that the proposed or existing rate is unjust and unreasonable. It is only after this antecedent showing has been made that the Commission properly can illustrate that its alternative rate proposal is both just and reasonable. *See id.* at 1314.

In recent years, we have rejected a series of rate orders on the grounds that the Commission had failed to adhere to this statutory distinction. Our *Western Resources* decision typifies the reaction that past FERC rate-setting ignoring that distinction has evoked. *Western Resources,* 9 F.3d 1568. There, the Commission had rejected a proposed rate increase by Panhandle Eastern Pipeline Company, substituting in its place an alternative rate formulated by the Commission staff. Defending this rate in a petition for review before this court, FERC maintained that its formulation needed only to satisfy the section 4 just and reasonable standard. In its view, the proposed rate had met this standard by half; accordingly, it ordered a rate that amounted to exactly 50% of the pipeline's proposal. In rejecting this reasoning, as well

as the rate it sought to justify, this court noted that it

> has consistently disallowed attempts to blur the line between §§ 4 and 5. As we complained four years ago, 'on four occasions in the last three years this court has reviewed Commission efforts to compromise § 5's limits on the power to revise rates. On each the court has repelled the Commission's gambit. This is number five.' We now make it an even six.

9 F.3d at 1568 (internal citations omitted).

FERC decisions specifically addressing the appropriate recovery method for the cost of expansion facilities—*i.e.,* incremental versus rolled-in pricing—have faced similar repudiation. In *Algonquin,* 948 F.2d 1305, for example, this court rejected a modification of proposed incremental rates on the grounds that the Commission had failed to establish that the proposed continuation of incremental treatment would be unjust and unreasonable. In support of its order to roll-in their cost, FERC had asserted generally that the new facilities both increased the overall reliability of the pipeline and made any future expansion easier and cheaper. *See id.* at 1312. Rejecting these conclusions as unsubstantiated, the court directed the Commission to undertake an analysis of the benefits allegedly associated with the expansion facilities, and to outline "with reasonable particularity the system-wide benefits which each new facility produces" before it could order rolled-in treatment under NGA section 5. *Id.* at 1313. In *TransCanada,* 24 F.3d 305, FERC ordered the incremental pricing of expansion facilities where the pipeline had proposed to roll-in the costs. In its *TransCanada* proceedings, FERC had articulated a new standard for determining the propriety of rolled-in versus incremental pricing, which this court styled the "commensurate benefits" test. *Id.* at 308. Under this standard, FERC weighed the system-wide benefits that the expansion facilities provided existing customers against the costs to those same customers of rolled-in treatment; on the record before it, the Commission found those benefits insufficient to support the proposed roll-in. After comparing it with *Battle Creek,* we concluded that the "commensurate bene-

fits" test constituted a departure from preexisting Commission policy. As it had not been dictated by any supervening decision of this court, and FERC had failed to provide a reasoned explanation for this policy shift, we rejected FERC's rate order and remanded for further consideration and elaboration. *See id.* at 310.

### b. *The NET/T–180 Facilities*

The parties before us disagree as to the proper reading of these decisions. According to JMC Power, *Algonquin* and *TransCanada,* together with *Southeastern Michigan Gas Co. v. FERC,* 133 F.3d 34 (D.C.Cir.1998) (affirming the rolled-in treatment of expansion facilities' cost adopted by FERC on remand from *TransCanada*), collectively require application of *Battle Creek* to the NET/T–180 facilities. In its view, *Battle Creek* controls irrespective of the particular cost-recovery method proposed by the pipeline. Having demonstrated that the expansion facilities are integrated with Tennessee's mainline pipeline and having articulated qualitative system benefits, JMC Power claims to have satisfied *Battle Creek's* requirements for rolled-in pricing, whether assessed under section 4 or section 5. By contrast, FERC asserts that JMC Power has failed to satisfy the section 5 burden imposed by our NGA jurisprudence, as the pipeline had proposed incremental pricing for the NET/T–180 facilities. In its view, a determination that rolled-in pricing would satisfy *Battle Creek* if such rates had been proposed by the pipeline does not carry with it a concomitant determination that incremental pricing would necessarily be unjust and unreasonable. Rather, these two inquiries must be kept separate from one another; to collapse them would violate the settled doctrine that there is no single just and reasonable rate. *See Tennessee III,* 80 F.E.R.C. at 61,223–24 & n. 107 (citing *Permian Basin Area Rate Cases,* 390 U.S. 747, 767, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944)). In order to satisfy the NGA's grant of primary initiative for rate-setting to the pipeline, as well as this court's derivative and repeated assertion that section 5 of the NGA imposes a more rigorous evidentiary

burden than section 4, FERC contends that the two prongs of *Battle Creek* cannot any longer constitute the sole measure for determining the propriety of incremental versus rolled-in pricing. Mindful of the Commission's broad discretion over the proper allocation of costs among a pipeline's customers, *see Algonquin,* 948 F.2d at 1313; *Consolidated Gas Supply Corp. v. FPC,* 520 F.2d 1176, 1185 (D.C.Cir.1975), we endorse FERC's reading.

An avowed refinement of the *Battle Creek* standard in light of supervening decisions by this court, the minor policy shift that FERC articulated in Opinions 406 and 406–A is reasoned and justified. As FERC explicitly acknowledged in Opinion 406–A, our *Algonquin* and *TransCanada* decisions reveal that "the Commission's past practices with respect to rolled-in [versus] incremental pricing did not give sufficient weight to this statutory scheme." *Tennessee III,* 80 F.E.R.C. at 61,224. By separating the inquiry into whether a proposed rate is unjust and unreasonable from that into whether FERC's alternative formulation is just and reasonable, FERC tailored its policy to our jurisprudence. This clarification accords with our repeated emphasis of the necessary distinction between section 4 and section 5 ratemaking proceedings, and accordingly with the text and structure of the NGA. *Cf. Clark–Cowlitz Joint Operating Agency v. FERC,* 826 F.2d 1074 (D.C.Cir.1987) (in banc) (reinterpretation of FERC policy more compelling when animated by belief that earlier policy thwarted congressional intent).

Unlike the "commensurate benefits" test that this court remanded in *TransCanada,* the refinement of *Battle Creek* currently before us has been fully explicated below. In Opinions 406 and 406–A, the Commission announced its attempt to reconcile the tension between *Battle Creek* and the evidentiary constraints of NGA section 5. It went on to provide an elaborate and reasoned justification for what we consider a reasonable reconciliation. *See Tennessee II,* 76 F.E.R.C. at 61,115–16; *Tennessee III,* 80 F.E.R.C. at 61,223–25. Although FERC did not explicitly rely upon its 1995 Pricing Policy Statement, *see* discussion *supra* note 9,

the emphasis on the 5% cost impact figure that is present in the filings of the parties, the ALJ's decision, and the Commission's discussion, evidences a keen awareness of its background presence. FERC clearly referenced and reiterated the justifications underlying the Pricing Policy Statement in its *Tennessee II* and *Tennessee III* decisions, and its desire to prevent unwarranted rate shocks lends further support for its refinement of *Battle Creek.*

■■■ We agree with FERC that the alternative reading proffered by JMC Power improperly collapses the section 5 analysis into a single determination that rolled-in pricing would be reasonable under *Battle Creek.* On this theory, it makes no difference whether the pipeline proposed incremental or rolled-in rates, as the inquiry under either section 4 or section 5 would be the same. So long as the proponent of rolled-in treatment could show that the expansion facilities are integrated with the pipeline and provide some qualitative benefits, rolled-in treatment would be necessitated. This reading falters on at least two grounds. First, it ignores the statutory distinction between section 4 and section 5 rate-setting.[17] As this court has repeatedly emphasized, and we reiterate, section 5 contains two separate and distinct components. We will not approve a rate formulated by FERC unless the Commission has shown (i) that the proposed and rejected rate is unjust and unreasonable and (ii) that its alternative formulation is just and reasonable.

Second, despite its pretension to the contrary, the reading articulated by JMC Power is not in any way dictated by any prior decision of this court. Nothing we have said can be reasonably read to limit FERC's freedom to modify its previous policies in the manner here chosen. In *TransCanada,* we remanded FERC's orders on the grounds that the Commission had failed to supply a sufficient explanation for the new "commensurate benefits" test it had utilized below. Nevertheless, we invited FERC to provide the sort of reasoned explanation contained in Opinions 406 and 406–A. This court's most recent decision in this area, *Southeastern Michigan,* 133 F.3d 34, lends further support to the refinement of *Battle Creek* that FERC has here undertaken. There, in upholding FERC's *Great Lakes I,* 72 F.E.R.C. ¶ 61,081, *reh'g denied,* 75 F.E.R.C. ¶ 61,089 (1996) ("*Great Lakes II*"), decision on remand from *TransCanada,* where FERC had approved the proposed rolled-in pricing, this court acknowledged that "[o]n both a theoretical and practical basis, it is perfectly possible for both cross-subsidization[18] and system-wide benefits to exist on the same facts." 133 F.3d at 41. Although the court did not make the logical connection between this possibility and the potential existence of multiple just and reasonable rates, its assertion implicitly acknowledges one of the core ideas underlying FERC's refinement of *Battle Creek.* It is because cross-subsidization and system-wide benefits can coexist that there is no single "magic point" at which incremental or rolled-in pricing becomes unjust. *Tennessee III,* 80 F.E.R.C. at 61,224. While incremen-

---

**17.** FERC properly accorded different treatment to the FSST/T–149 facilities, for which Tennessee Gas had proposed rolled-in pricing. Since Tennessee Gas proposed incremental treatment for the NET/T–180 facilities, and since JMC Power failed to carry its initial burden of establishing that such treatment would be unjust and unreasonable, FERC properly approved the rate filing. Due to the distinction between section 4 and section 5 proceedings, we reject JMC Power's additional assertion of discriminatory treatment as meritless.

JMC Power makes a separate claim of discrimination which emerges directly out of this court's *TransCanada* decision. Therein, we had concluded that FERC failed to assess whether incremental pricing of integrated facilities is necessarily discriminatory. *See TransCanada,* 24 F.3d at

311. In the proceedings below, the Commission explicitly responded to this challenge, going to great lengths to establish why, given the particular facts of this case, incremental treatment was just and reasonable. Since differential rates founded upon differences of fact do not constitute discrimination, FERC clearly responded to the concerns we had articulated in *TransCanada.* *See generally Tennessee II,* 76 F.E.R.C. at 61,113– 15; *Tennessee III,* 80 F.E.R.C. at 61,223–27.

**18.** Cross-subsidization occurs when expansion facilities that provide limited benefits to an integrated pipeline system receive rolled-in treatment. Where pre-expansion customers bear a portion of the construction costs that is not equivalent to the benefits they receive, they essentially subsidize the investment undertaken on behalf of the expansion customers.

tal treatment may be required at one end of the rate-setting continuum, and rolled-in pricing required at the other, in between the two extremes lie a series of intermediate points in which both cost-recovery methods would satisfy section 4's just and reasonable test.[19] At each of these places along the continuum, the pricing mechanism will essentially lie in the hands of the initiating pipeline. It is only when the proposed rate crosses the boundary separating the just from the unjust that FERC can act under its section 5 authority to order a rate of its own formulation.

### c. *FERC's Use of Quantitative Measures*

■ JMC Power also makes much of the fact that FERC allegedly assessed both the costs as well as the postulated system benefits of the NET/T–180 expansion on a quantitative basis, alleging that the use of any quantitative standard was unlawful. While JMC Power attaches many of its previous arguments to this claim, it also makes an independent assertion that the use of a quantitative standard is in and of itself arbitrary, capricious, or contrary to law. We reject this contention, as it rests upon a misreading of this court's caselaw and defies both logic and common sense.

JMC Power's argument is difficult to reconstruct, but it seems to begin from this court's statement in *Battle Creek* that the rolled-in treatment of new facilities is just and reasonable when they are integrated with the pipeline and provide system-wide benefits. Although the Trunkline Gas Company had not quantified the benefits that would likely accrue from the expansion facilities, in the form of increased capacity and a reduction in the costs of planned future expansions designed to meet the supply needs of all customers, the *Battle Creek* court held that the existence of the benefits had been sufficiently established to support rolled-in treatment. 281 F.2d at 47–48. In *Algonquin*, this court rejected an assertion of sys-

tem-wide benefits that failed to establish the existence of any such benefits with "reasonable particularity," but rested instead upon conclusory assertions of fact. 948 F.2d at 1313. *Algonquin* thereby called into question excessive reliance upon unsubstantiated qualitative benefits. In *TransCanada*, by contrast, the court cut off any shift towards requiring quantitative elaboration, emphasizing that the *Algonquin* decision "was careful not to require a balancing of costs and benefits (much less a quantification thereof)." 24 F.3d at 308. From this statement, JMC Power seemingly reads a ban on the use of quantitative analysis into this court's decisions.

However, the mere fact that the court has not *required* the explicit quantification of benefits which, as this case well illustrates, are difficult to forecast with precision, does not carry a concomitant *prohibition* on the use of quantitative measures. Where the parties expend the necessary resources to allow for quantitative projections, FERC is not forbidden from looking at those estimations. *Cf. Southeastern Michigan*, 133 F.3d at 41 ("when an expansion is both integrated and to the benefit of existing users, FERC *is not bound* to study the quantitative effect of rolling in construction costs") (emphasis added). While JMC Power goes to great lengths to establish that FERC utilized a "strict quantitative standard," the evidence does not bear out its contention. Once it is understood that FERC simply attempted to assess whether JMC Power had made out a claim that incremental pricing would be unjust and unreasonable, all of its allegedly damning statements become innocuous. They amount to nothing more than a determination that the alleged benefits proffered by JMC Power, which FERC found to be either speculative or to the primary benefit of the NET/T–180 customers, did not establish that incremental pricing would be unjust. For the same reason, FERC did not err in referencing its finding that rolling-in the ex-

---

19. Although formulated in different terms, the *Battle Creek* court recognized this variability in its statement that

[w]hether the cost of a particular facility is more properly treated as a systemic cost and rolled-in to the rate base of all of the custom-

ers, or as a segregated cost to a particular customer, which should be treated on an incremental basis, is frequently a difficult issue of fact presented to the Commission.

281 F.2d at 47.

pansion facilities would have a rate impact of greater than 6%. That finding merely supports its conclusion that the section 5 burden had not been satisfied.

JMC Power fails to recognize the import of such quantitative estimations because it seeks to collapse the two prongs of the section 5 analysis into a single assessment of whether rolled-in rates would be just and reasonable. Once it is recognized that NGA section 4 and section 5 have different requirements, however, it becomes clear that FERC can properly utilize quantitative measures of costs and benefits in making a section 5 assessment of whether a proposed cost-recovery method would be unjust and unreasonable.

2. *The* Great Lakes *Decisions and Reliance*

■ After this court's *TransCanada* decision, which invalidated FERC's application of its newly-crafted "commensurate benefits" test for failure to provide a reasoned explanation for its departure from *Battle Creek*, FERC ordered a roll-in of the expansion facilities' costs at issue. *See Great Lakes I*, 72 F.E.R.C. ¶ 61,081. Rather than articulating a sufficiently detailed justification for its policy shift, FERC decided that, on the facts of the case, it would be more equitable simply to apply *Battle Creek*. At the time that the Great Lakes expansion shippers had made substantial financial commitments for the planning and construction of the additional pipeline facilities, *Battle Creek* provided the prevailing backdrop. In its petition for review, JMC Power argues that it too relied upon the continued application of *Battle Creek* when making its own financial commitments. In its view, the same principles of equity and nondiscrimination that FERC relied upon in *Great Lakes I* dictate adherence to *Battle Creek* in this case as well. We do not agree.

Despite the alleged similarities stressed by JMC Power between its situation and that of the Great Lakes expansion shippers, material differences separate the respective business and regulatory environments that they confronted. First, and we think dispositive in light of our preceding discussion of the difference between section 4 and section 5 rate-settings, the pipeline company—Great Lakes Gas Transmission Limited Partnership—proposed rolling-in the costs of the expansion facilities at issue in the *Great Lakes* decisions. *See Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973) (plurality opinion) (factual differences serve to distinguish cases "when some legislative policy makes the differences relevant to determining the proper scope of the prior rule"). In the ensuing section 4 proceeding, FERC needed only to determine whether rolled-in pricing would be just and reasonable. Throughout its *Great Lakes II* opinion denying rehearing of its order approving the proposed rolled-in rates, 75 F.E.R.C. ¶ 61,089, FERC emphasized the procedural posture of the dispute and the resulting evidentiary burdens. Responding to objections made by a pre-expansion customer—Texas Eastern—FERC distinguished a series of its own previous decisions ordering incremental treatment on the grounds that, in each case, incremental rates had been proposed by the pipeline in a section 4 rate filing. "In all but one of the cases Texas Eastern cites, the Commission implemented incremental rates at the request of the pipeline. The other case ... did not involve facilities-based incremental charges...." *Id.* at 61,272.

The assertion that the NET/T–180 shippers stand in the same position as the Great Lakes expansion shippers cannot survive the comparison. Since Tennessee Gas proposed to continue the existing incremental treatment of the NET/T–180 facilities, this case presents the very scenario expressly distinguished in *Great Lakes II*. Moreover, FERC's opinion there went on to note that, where the pipeline proposes incremental treatment, "the Commission can only order rolled-in rates if it meets its burden under NGA section 5 to show that the existing non-rolled-in rates are unjust and unreasonable, and rolled-in rates are just and reasonable." *Id.* In the present case, FERC concluded that JMC Power had failed to satisfy its burden of establishing that the proposed incremental rates are unjust and unreasonable. We have not been directed to any evidence in

the record that points to a contrary direction, and see no reason to disrupt this conclusion.

Turning to the facts underlying the *Great Lakes* decisions, we note that the original certification of the Great Lakes expansion provided for rolled-in treatment of the facilities' cost. Given that Great Lakes Transmission L.P. is an affiliate of TransCanada Pipelines, its largest customer, TransCanada knew that the pipeline would seek to continue rolled-in treatment in its next rate filing. Accordingly, its assumption that *Battle Creek* would continue to apply in the resulting section 4 proceeding, and that the expansion facilities would continue to receive rolled-in treatment, was reasonable. In the present case, by contrast, the original certification process provided for incremental pricing of the NET/T–180 facilities, without any guarantee or firm commitment that the pipeline would necessarily seek rolled-in rates at the next section 4 proceeding. *See Tennessee II*, 76 F.E.R.C. at 61,115. The Commission held that JMC Power had no reasonable expectation of rolled-in treatment, and we agree. As *JMC Power* makes no other claim that the application of FERC's refinement of *Battle Creek* would entail a "manifest injustice," *Clark–Cowlitz,)* 826 F.2d at 1081, we uphold its application to the NET/T–180 facilities.

### C. Conclusion

For the reasons stated, JMC Power's petition for review is denied.

### PART II: THE FSST/T–149 AND BOUNDARY FACILITIES AND THE NIAGARA SPUR CHARGE

Equitable Gas Company petitions for review of the Commission's orders in *Tennessee II*, *reh'g denied*, *Tennessee III*. In the relevant portions of these orders, the Commission approved Tennessee's proposal to recover the costs of a series of facility expansions, collectively referred to as the FSST/T–149 and Boundary facilities, on a "rolled-in" basis, and rejected Tennessee's proposed "Niagara Spur Charge," an incremental surcharge to Tennessee's open-access firm

transportation rate (Rate Schedule FT–A) concerning Tennessee's Niagara Spur facilities. Equitable claims that the Commission wrongly reviewed Tennessee's roll-in proposal under section 4 instead of section 5 of the Natural Gas Act and that the Commission wrongly denied Equitable's request for a rehearing on the Niagara Spur Charge. We hold that Opinions 406 and 406–A properly followed the statutory framework set up by the Natural Gas Act and that the Commission acted well within its discretion in denying Equitable's request for a rehearing. We therefore deny Equitable's petition for review.

### A. Background

Tennessee's pipeline system divides into seven zones. Zones 0 and 1 (the Texas and Southern Zones) comprise Tennessee's production area. The remaining zones (Central, Eastern, Northern, New York, and New England) comprise its market area. Between 1984 and 1993, Tennessee constructed four independent expansion projects in Zones 5 and 6, including the FSST/T–149, Boundary, and Niagara Spur facilities.[20]

Tennessee designed its FSST/T–149 facilities to provide service to nine customers in Zone 6 and one customer in eastern Zone 5. Constructed along scattered portions of Tennessee's mainline in Pennsylvania, New York, New Jersey, Connecticut, Massachusetts, and New Hampshire, the facilities include approximately 74 miles of looping and 17,300 horsepower of new and additional compression. The original estimated cost of the facilities was $99,043,000.

Tennessee's Boundary facilities were built to provide additional gas service to four eastern Zone 5 and nine Zone 6 customers to meet their peak period needs. These facilities consist of approximately ten mainline looping segments totaling 40 miles in various counties of Pennsylvania and Tennessee.

Pursuant to settlements the Commission approved in 1985 and 1987, Tennessee agreed to recover the costs of the FSST/T–149 and

---

**20.** These projects primarily involved the addition of mainline looping and compression. The looping increased the carrying capacity of the entire

pipeline. *See Algonquin*, 948 F.2d at 1308–09 n. 4. Both the looping and the increased compression protect customers from outages.

Boundary facilities initially by incremental rates. Then, in its 1991 general rate filing pursuant to section 4 of the Natural Gas Act, 15 U.S.C. § 717c, Tennessee proposed to roll in the costs of the FSST/T–149 and Boundary facilities. *See Tennessee II,* 76 F.E.R.C. at 61,095–96.

The Commission suspended Tennessee's 1991 filing for five months and ordered an evidentiary hearing before an administrative law judge to resolve cost allocation and rate design issues. Two years later, in October 1993, the Commission approved a settlement among Tennessee and its customers resolving all questions concerning the allowable level of cost Tennessee could recover in its rates. The settling parties left for prospective resolution before an administrative law judge ("ALJ") the allocation of costs of the new facilities among Tennessee's customers, and the design of Tennessee's rates. *See id.* at 61,080.

In an initial decision issued after hearings, *Tennessee I,* 72 F.E.R.C. ¶ 63,005, the ALJ ruled that Tennessee—and its customers supporting the rolled-in pricing of the FSST/T–149 and Boundary facilities—had the burden under section 5 of the Act to show both that incremental pricing of those facilities was unjust and unreasonable, and that the proposed rolled-in pricing was just and reasonable. *See id.* at 65,068. Concluding that Tennessee and the other proponents of rolled-in pricing had not met that burden, *see id.* at 65,068–69, the ALJ held that Tennessee could not recover the costs of the FSST/T–149 and Boundary facilities on a rolled-in basis.

The ALJ also addressed Tennessee's proposal to modify the previous rolled-in rate treatment of the Niagara Spur by creating a new, incremental Niagara Spur Charge. Because the Niagara Spur is integrated into Tennessee's system and was intended to benefit the Tennessee system as a whole, the ALJ rejected Tennessee's proposal. *See id.* at 65,073.

On review, the Commission reversed the ALJ's ruling with respect to the FSST/T–149 and Boundary facilities. *See Tennessee II,* 76 F.E.R.C. at 61,097–104. The Commission held that because Tennessee had proposed the change to rolled-in pricing under section 4 of the Act, Tennessee needed to establish only that rolled-in pricing was just and reasonable without the additional burden of establishing that incremental rates were unjust and unreasonable under section 5. *See id.* at 61,097–104. Finding that Tennessee had met its section 4 burden of proof, the Commission approved Tennessee's proposal to roll in the costs of the FSST/T–149 and Boundary facilities. *See id.* at 61,098–104. The Commission also affirmed the ALJ's rejection of Tennessee's proposed incremental Niagara Spur Charge. *See id.* at 61,107–08.

Equitable, a distributor of natural gas in Pennsylvania, West Virginia and Kentucky, sought rehearing, which the Commission denied in Order 406–A. See *Tennessee III,* 80 F.E.R.C. at 61,070.

B. *Discussion*

The first issue Equitable raises is whether section 4 or section 5 of the Act governs Tennessee's proposal to roll in the costs of its FSST/T–149 and Boundary facilities. As discussed in Part I of this opinion, the approval or rejection of rates proposed by the pipeline is governed by section 4. *See* 15 U.S.C. § 717c. Under section 4, the pipeline must prove that its proposed rates are just and reasonable. *See* 15 U.S.C. § 717c; *see also Public Serv. Comm'n v. FERC,* 866 F.2d 487, 488 (D.C.Cir.1989). Section 5 applies when the Commission or an intervenor seeks to impose on the pipeline rates different from either present rates or rates proposed by the pipeline. *See* 15 U.S.C. § 717d. Under section 5, the Commission or the intervenor must prove that the pipeline's present rates are not just and reasonable and that the new rates proposed by the Commission or the intervenor are just and reasonable. *See* 15 U.S.C. § 717d; *see also Public Serv. Comm'n,* 866 F.2d at 488.

It was Tennessee who proposed to roll in the costs of the FSST/T–149 and Boundary facilities. One would therefore suppose that section 4 governed the rate proceeding. Equitable nevertheless insists section 5, rather than section 4, applies. It claims that once Tennessee canceled its rate change request,

there was no longer any basis for using section 4. The trouble with Equitable's argument is that Tennessee did not, in fact, withdraw its proposal and did not abandon its stated desire for rolled-in pricing of its FSST/T–149 and Boundary facilities. Equitable has another line of argument based on the fact that Commission trial staff and other parties—but not Tennessee—presented the evidence in support of Tennessee's rate-change request concerning the FSST/T–149 facilities.[21] According to Equitable, whether section 4 or section 5 governs depends not on the identity of the party proposing the rate change, but on the identity of the party supporting the rate change with evidence at the hearing. Since the pipeline here did not mount the case in its favor, section 4 did not control. Nothing in the Act or this circuit's precedent suggests, let alone supports, this theory. When choosing between section 4 and section 5, the Act makes the source of the proposed rate change decisive. *See East Tenn. Natural Gas Co. v. FERC*, 863 F.2d 932, 937 (D.C.Cir.1988). Because the pipeline (Tennessee) proposed the rate change concerning the FSST/T–149 and Boundary facilities, the Commission properly followed the framework set up by the Act and applied section 4. *See Sea Robin Pipeline Co. v. FERC*, 795 F.2d 182, 183–84 (D.C.Cir.1986).[22]

 This leads to Equitable's second challenge. Even if section 4 governs Tennessee's rate-change request, Equitable tells us that the Commission erred in another respect—namely, in holding that Tennessee proved that rolled-in rates were just and reasonable. Equitable argues that Tennes-

see could not have met its section 4 burden of proof because Tennessee itself did not present any evidence at the hearing to support its proposal.

 *City of Winnfield, La. v. FERC*, 744 F.2d 871 (D.C.Cir.1984), forecloses Equitable's line of reasoning, although no one saw fit to cite the decision to us. That case involved § 205 of the Federal Power Act, 16 U.S.C. § 824d, which requires utilities to prove that their rate-change proposals are just and reasonable. The precise question in *City of Winnfield* was whether an electric utility could meet its burden of proof under § 205 even though Commission staff—not the utility—presented key evidence in support of a rate change. *See* 744 F.2d at 876. The court held that "[i]f evidence is introduced in the proceeding supporting a rate increase, the increase can lawfully be imposed, regardless of the source from which that evidence comes." *Id.* at 877. In reaching this conclusion, the court noted that the burden of proof requirement under § 205 relates to the burden of persuasion (or, more accurately, the risk of non-persuasion), not to the burden of production, and thus the identity of the party submitting evidence is not dispositive. *See* 744 F.2d at 877.[23] Section 205 of the Federal Power Act and section 4 of the Natural Gas Act are identical in form and have been treated as identical in substance. *See* 744 F.2d at 875; *compare* 16 U.S.C. §§ 824d(e) & 824e(a) *with* 15 U.S.C. §§ 717c(e) & 717d(a). There is no reason to adopt one set of evidentiary rules for rate proposals from utilities but a different set for rate proposals from pipelines. We therefore

---

**21.** Tennessee provided some of the evidentiary support for rolling in the costs of the Boundary facilities.

**22.** This is not inconsistent, as Equitable claims, with the Commission's decision to apply section 5 to the New England Customer Group's proposal to eliminate the direct assignment of Tennessee's New England lateral facilities' costs. Because the New England Customer Group proposed rates different from those urged by the pipeline, the Commission properly applied section 5 to the New England Customer Group's proposal. *See* 15 U.S.C. § 717d.

**23.** The procedural setting of *City of Winnfield* was unusual. The utility proposed incremental

pricing to replace its average cost rates but indicated that if the Commission rejected this proposal, the utility would accept a staff proposal to increase the utility's average cost rates. *See* 744 F.2d at 873. In the § 205 proceeding, the Commission declined to permit the incremental pricing proposal but granted the average cost rate increase. *See id.* at 875. The court stated that "it would be wasteful to require, instead of the sensible procedure adopted here, that the Commission first deny [the utility's] requested increase and that the utility then commence a separate § 205 proceeding proposing the acceptable increase of rates under the existing scheme that the Commission staff had suggested." *See id.* at 876–77.

hold that in a proceeding supporting a rate change pursuant to section 4 of the Natural Gas Act, a pipeline may rely on any submitted evidence—regardless of its source—to satisfy its burden of proof.

The two previous Commission decisions Equitable cites do not change our mind about this. According to Equitable, under *Equitrans, L.P.*, 80 F.E.R.C. ¶ 61,144 (1997), order on reh'g, 81 F.E.R.C. ¶ 61,030 (1997), and *El Paso Natural Gas Co.*, 48 F.E.R.C. ¶ 61,-018 (1989), the Commission must reject pipeline-initiated filings if the pipeline fails to support the filing with evidence. The facts in those cases differ from the facts in this case. As the Commission pointed out, in *El Paso*, no party furnished any evidence to support the filing. In *Equitrans*, the pipeline submitted some evidence to support its filing, but the Commission described it as "seriously deficient."[24] 81 F.E.R.C. at 61,-157. In marked contrast, here no one disputes that intervenors and the Commission trial staff presented extensive evidence to support Tennessee's filing. Equitable does not challenge the adequacy of the evidence. The issue, according to Equitable, is whether the standard governing a pipeline's rate proposal turns on the identity of the party supporting the filing with evidence. As *City of Winnfield* makes clear, it does not.

■■■■ One other detail about Tennessee's filing merits mention. ·Equitable contends that Tennessee failed to submit certain statements required by 18 C.F.R. §§ 154.301 & 154.312. Although the record is not clear in this regard, the Commission appeared to concede at oral argument that Tennessee may not have filed some documents required by Commission regulations. We will assume,

arguendo, that Tennessee failed in this respect. But we will not assume that Tennessee's neglect obligated the Commission to reject its filing. The Commission has broad discretion to decide whether a filing substantially complies with its regulations. *See United Gas Pipe Line Co. v. FERC*, 707 F.2d 1507, 1512 (D.C.Cir.1983). The Commission may even accept defective filings. *See id.* That seems to be the posture the Commission adopted with respect to Tennessee's filing. In any event, it does not appear that Equitable raised this issue in a timely manner before the Commission. Equitable thus cannot raise it—and this court will not address it—now. See 15 U.S.C. § 717r(b).

■■■■ The third issue Equitable raises is whether the Commission abused its discretion by not rehearing a proposal to reinstate Tennessee's proposed Niagara Spur Charge.[25] The Commission held that rolled-in pricing of the Niagara Spur facilities was just and reasonable. Equitable argues that the Niagara Spur cost-allocation decision warranted a rehearing because the Commission allowed further hearings on a cost-allocation issue involving Tennessee's New England lateral facilities.

The Commission reasonably treated the two questions differently, ordering a rehearing in one but not the other. After a review of the record and allegations by the New England Customer Group regarding the treatment of non-New England lateral facilities, the Commission concluded that the existing cost-allocation of the New England laterals potentially violated the anti-discrimination provisions of section 5 of the Act. Although a hearing had already been held on the general issue of the justness and reason-

24. Equitable also cites *Pacific Gas Transmission Co.*, 66 F.E.R.C. ¶ 61,384 (1994). But that case does not address the issue here, namely, whether a pipeline's failure to support a section 4 filing with evidence requires the Commission to reject the pipeline's filing.

25. Tennessee's Niagara Spur is located in Zone 5 and extends from an interconnection between the systems of Tennessee and a Canadian pipeline at the Niagara River to a connection with Tennessee's mainline at East Aurora, New York. The expansion of the Niagara Spur facilities involved the addition of odorization facilities and

permanent compression facilities. The new facilities increased pressure on the Niagara Spur so that Tennessee could begin using the Niagara Spur to deliver gas to mainline customers. The Niagara Spur Charge recovers approximately half of the cost of the Niagara Spur facilities ·from those Rate Schedule FT–A shippers with primary receipt points on the Niagara Spur for delivery of transportation of Canadian gas supply into Tennessee's Zones 5 and 6. The remaining Niagara Spur costs are allocated to incremental Rate Schedule NET–Segment 1 shippers with firm transportation rights on the Niagara Spur.

ableness of that allocation methodology, the specific subsidiary issue whether the methodology is unduly discriminatory was not fully explored. In order to answer that question on the merits, the Commission believed it needed to develop the record further, and thus ordered a rehearing. The situation with the Niagara Spur cost-allocation issue was different. The record regarding this subject was adequate to decide on the merits whether rolled-in pricing of the Niagara Spur facilities was just and reasonable. In the Commission's considered view, further hearings were not needed. *See Cajun Elec. Power Coop., Inc. v. FERC,* 28 F.3d 173, 177 (D.C.Cir.1994). We find no reason to question the Commission's judgment. For these reasons, and in deference to the Commission's expertise in deciding whether to conduct hearings in the first instance, *see Alabama Power Co. v. FERC,* 993 F.2d 1557, 1565 (D.C.Cir.1993); *Southern Union Gas Co. v. FERC,* 840 F.2d 964, 970–71 (D.C.Cir. 1988), we hold that its refusal to rehear a proposal concerning the Niagara Spur Charge fell well within the Commission's discretion.

### C. *Conclusion*

No useful purpose would be served by setting forth Equitable's other arguments. We have considered and rejected them. We therefore affirm the Commission's rulings in Opinions 406 and 406–A and its denial of Equitable's request for rehearing.

### PART III: THE UNIFORM HOURLY TAKE TARIFF

Consolidated Edison, Brooklyn Union, and the Long Island Lighting Companies (collectively "Con Ed") fare no better in contending that the Commission erred in concluding that Tennessee does not unduly discriminate in the implementation of a tariff provision governing the uniform hourly take of gas. The Commission reasonably found that while Tennessee routinely provides New England customers with greater hourly flexibility than New York area customers such as Con Ed, Tennessee was not unduly discriminatory because the two sets of customers were not

similarly situated, due to the operational constraints of the system.

### A. *Background*

A tariff provision affecting two of Tennessee's rate schedules requires customers to take "[a]s nearly as practicable" uniform hourly quantities of their daily entitlements to gas. § 4.11 of Rate Schedule FT–A; *see also* § 4.4 of Rate Schedule IT. Con Ed complained to the Commission that Tennessee does not uniformly apply that provision; while a flow control valve at the White Plains meter limited Con Ed's hourly take of gas to strictly ¹⁄₂₄ (or 4.2%) of its daily contract, New England customers, with no flow control valves in place at their meters, routinely could take up to 6% of their daily entitlements during any given peak hour "under an informal, unwritten, and unfiled agreement." *Tennessee I,* 72 F.E.R.C. at 65,116. At the rates in effect during the administrative proceedings, Con Ed claimed that it could have contracted for 31% less gas, at an annual savings of approximately $4 million, had it been given the same hourly flexibility as the New England customers. Contending that Tennessee's practice constitutes undue discrimination in violation of sections 4 and 5 of the Natural Gas Act, *see* 15 U.S.C. §§ 717c–717d, Con Ed claimed that it should be allowed the same degree of hourly flexibility, or in the alternative, if Tennessee was able to demonstrate that it was operationally incapable of resetting the meters to provide the same flexibility, then Con Ed should be charged a lower rate to reflect the "inferior" quality of service. 72 F.E.R.C. at 65,116.

In his initial decision, the ALJ found that there was no evidence of undue preference; the uniform hourly take provision applied to all of Tennessee's customers, and any customer was entitled to flexibility if it was operationally feasible for Tennessee to allow that customer to take gas in excess of its scheduled hourly entitlement. *Id.* at 65,121. Given its evenhanded application of the provision, Tennessee explained that any difference in the hourly flexibility of New York and New England customers was due to the system's operational design, requiring flow control devices on all of Tennessee's meters

with maximum daily quantities ("MDQs") of 100,000 Dekatherm ("Dth") per day or greater, such as the White Plains meter used to service Con Ed.[26] *Id.* at 65,118, 65,121. The ALJ found that if Tennessee removed or even reset the flow control valve on the White Plains meter to allow for the same flexibility as in New England, the amount of gas that Con Ed could potentially draw from the system would deplete the pipeline's flow, rendering Tennessee incapable of meeting its obligations to other regional customers. *Id.* In New England, however, no set of customers on a single meter could draw enough gas to compromise the system. The ALJ concluded, therefore, that Con Ed had not met its burden to demonstrate that Tennessee implemented its uniform hourly take provision in an unduly discriminatory way by treating similarly situated customers differently. *Id.* at 65,121.

The Commission affirmed the ALJ's ruling, finding that the difference in hourly flexibility was the result of operational constraints rather than preferential treatment: the evidence showed that Tennessee (1) installed flow control devices on all meters with MDQs of 100,000 Dth per day or greater, (2) permitted all customers subject to the tariff to vary their hourly takes if operationally feasible, and (3) applied the same operational standard to all of its customers, granting every customer a provisional right to hourly flexibility.[27] *Tennessee II*, 76 F.E.R.C. at 61,137–38. The Commission also found that the ability of customers to take in excess of their hourly schedule was not a firm entitlement; customers were still subject to the tariff restriction, and no customer had a firm right to hourly flexibility. *Id.* at 61,138.

To the extent that the consistent application of the operational standard resulted in differing degrees of hourly flexibility for New York and New England customers, the Commission agreed with the ALJ that it was due to the physical design of the system: given the size of the flow through the White Plains meter (300,000 Dth per day) and the proportion (50%) it comprised of the total pipeline capacity of the New York market, the Commission found that it was operationally not feasible for Tennessee to reset the White Plains meter to give Con Ed the same flexibility as Tennessee provided to New England customers, as none of their meters presented the same potential for endangering the service of others. *Id.* at 61,138–39. In addition, the Commission concluded that Con Ed failed to show "that a limitation upon hourly takes, in and of itself, apart from any considerations of undue discrimination, merits the reallocation of fixed costs and redesign of rates to reflect maximum hourly entitlements, instead of maximum daily quantities." *Id.* at 61,140.

In seeking rehearing, Con Ed asserted that the consistent application of the operational standard was irrelevant if the New England customers received, in effect, a firm right to hourly flexibility, and that the difference in flexibility did not constitute a reasonable variation in the nature of service received by the customers within a class. *Tennessee III*, 80 F.E.R.C. at 61,244–45. Furthermore, Con Ed maintained that the differences in flexibility resulted from Tennessee's intentional design of its system, making the resulting differences unduly discriminatory. Under the circumstances, Con Ed concluded, the proper remedy was to adjust rates to reflect that it received an inferior quality of service. *Id.* at 61,245.

The Commission denied rehearing. Although the New England customers received more hourly take flexibility than Con Ed, it was not undue discrimination, in the Commission's view, because the two were not similarly situated, and a rational basis existed for denying Con Ed the additional flexibility. *Id.* The record showed that the size and proportion of the White Plains meter required Tennessee to maintain flow control

---

26. As the Commission noted, the capacity of the White Plains meter is approximately 300,000 Dth per day; Consolidated Edison's MDQ alone is 165,000 Dth per day. *Tennessee II*, 76 F.E.R.C. at 61,135 n. 258.

27. The Commission noted that under the operational standard, Tennessee adjusted the flow control valve at the White Plains meter on several occasions in the winter to allow Con Ed to take gas in excess of $\frac{1}{24}$ of its MDQ per hour; in the summer, the flow control valve could be shut off altogether. 76 F.E.R.C. at 61,137 n. 274.

over Con Ed, while "no meter in New England present[ed] the same potential for endangerment of service that the White Plains meter present[ed]." *Id.* at 61,246. Because the differing degrees of flexibility resulted from the evenhanded application of an operational standard, the Commission opined that the evidence in the record demonstrated that the difference was not arbitrary. *Id.* The Commission rejected Con Ed's complaint that it received allegedly "inferior" service, inasmuch as Con Ed had failed to show that the lesser amount of hourly flexibility made the quality of service it received "inferior" to merit a rate adjustment. *Id.* The mere fact that Con Ed had to contact Tennessee officials to request flexibility while the New England customers could take additional gas off the system without contacting Tennessee officials, the Commission found was a "difference without substance." *Id.* (internal brackets omitted). The Commission noted, moreover, that Con Ed's service may be superior in other respects, such as delivery pressure, to the service in New England. *Id.* at 61,246 & 61,246 n. 183. In any event, regardless of whether the quality of service was inferior, the Commission concluded that Con Ed failed to justify its remedy of a downward rate adjustment because it had not shown that Tennessee incurred less costs in providing service with limited flexibility to New York customers "than it does in providing the more flexible service to the New England customers, or by showing that Tennessee incurs more costs to provide the New England customers with the extra flexibility." *Id.* at 61,247.

 Con Ed contends in its petition for review that because the differing degree of hourly flexibility available to New York and New England customers constitutes undue discrimination, the Commission erred in denying an appropriate remedy—namely an adjustment of its rate to reflect the inferior quality of service. *See* 5 U.S.C. § 706(2)(A),(E). Intervenors, Tennessee and the Bay State Gas Company, contend as a preliminary matter that the court is barred from entertaining what in effect is a new claim of undue discrimination. *See* NGA § 19(b), 15 U.S.C. § 717r(b); *Louisiana Ass'n of Indep. Producers & Royalty Owners*

*v. FERC,* 958 F.2d 1101, 1117 n. 8 (D.C.Cir. 1992). We disagree. Intervenors maintain that throughout the administrative proceedings, Con Ed's claim of undue discrimination was consistently one of outright preference, in which Tennessee granted additional hourly flexibility to New England customers rather than New York. Con Ed's allegedly new position, that the undue discrimination arises from the fact that it pays the same rate while receiving inferior service, was thus never argued before the Commission. In fact, Con Ed's petition for rehearing articulated the theory of discrimination it raises now on appeal. We therefore address Con Ed's contention, and do so with the recognition that the Commission has broad discretion in exercising its authority under the NGA, *see Tennessee Gas Pipeline Co. v. FERC,* 860 F.2d 446, 452 (D.C.Cir.1988), and that the court may not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Our review is limited to assuring that the Commission's orders are reasoned, principled, and based upon the record. *See, e.g., Pennsylvania Office of Consumer Advocate v. FERC,* 131 F.3d 182, 185–86 (D.C.Cir. 1997), *modified,* 134 F.3d 422 (D.C.Cir.1998); *Western Resources,* 9 F.3d at 1572; *Columbia Gas Transmission Corp. v. FERC,* 628 F.2d 578, 593 (D.C.Cir.1979).

B. *Discussion*

 Under the NGA, *see* 15 U.S.C. §§ 717c, 717d, differences in the rates paid by two sets of customers are not always unduly discriminatory. Rather, to show undue discrimination, the petitioner must demonstrate that the two classes of customers are similarly situated for purposes of the rate. *See, e.g., Tennessee Gas,* 860 F.2d at 452 n. 9; *City of Vernon v. FERC,* 845 F.2d 1042, 1046–47 (D.C.Cir.1988); *Consolidated Edison Co. v. FERC,* 676 F.2d 763, 773 & 773 n. 31 (D.C.Cir.1982).

In its request for rehearing, Con Ed did not challenge the Commission's findings that the largest meters of 100,000 Dth per day or greater, such as the one in White Plains, New York, required flow control devices

while the smaller meters, such as many of those in the New England states, remained on pressure control. *See* 80 F.E.R.C. at 61,245. The Commission reasonably concluded that this operational distinction, which created the difference in hourly flexibility the two groups received, showed that the New York and New England customers were not "similarly situated," and that therefore there was no undue discrimination because Tennessee had a rational basis for treating the two differently. *See id.* at 61,245–46.

 The capacity constraints also entered into the Commission's analysis. It found, and Con Ed did not contest, that the capacity of the White Plains meter comprised half of the New York area market, *see* 76 F.E.R.C. at 61,138–39, 80 F.E.R.C. at 61,245–46, and to the extent Con Ed could take gas off the system in excess of the uniform hourly requirement, that Con Ed could potentially deplete the availability of service in the area, adversely affecting other Tennessee customers. 80 F.E.R.C. at 61,246. "[D]ifferences ... based on relevant, significant facts which are explained are not contrary to the NGA." *TransCanada Pipelines Ltd. v. FERC*, 878 F.2d 401, 413 (D.C.Cir.1989); *see also Metropolitan Edison Co. v. FERC*, 595 F.2d · 851, 857 (D.C.Cir.1979); *St. Michaels Utils. Comm'n v. FPC*, 377 F.2d 912, 915 (4th Cir.1967). The Commission noted the difference in operational circumstances but found that Tennessee applied the same feasibility standard to all customers in determining whether to grant additional flexibility. *See* 80 F.E.R.C. at 61,246. For these reasons we conclude that the Commission gave an adequate explanation of how it reached its conclusion that there was no undue discrimination; the record substantially supported the Commission's findings that the two customer groups were not similarly situated, and a rational, non-discriminatory basis existed for the difference in situation, namely operational constraints.

Contrary to Con Ed's contention, the Commission did not give inconsistent reasons in Opinion Nos. 406 and 406–A. The Commission, in Opinion 406, affirmed the ALJ's finding that although there was in fact a difference in the degree of hourly flexibility, it was

not a "substantive difference in treatment between the New York customers and New England customers on the part of Tennessee" because no customer had a firm right to ·that flexibility and all customers were given the same opportunity to vary their hourly takes if operationally feasible. 76 F.E.R.C. at 61,140. In Opinion No. 406–A, the Commission again acknowledged that "although Tennessee assesses all customer requests to vary hourly takes under the same standard, in practice, there is a difference between the hourly take flexibility that the New England customers receive and the flexibility that the New York customers receive." 80 F.E.R.C. at 61,245. The Commission then explained that the difference in treatment was not unduly discriminatory; in other words, it was "not a substantive difference in treatment" because the customers were not similarly situated and Tennessee had a rational basis for treating them differently. *Id.*

 Citing *Alabama Elec. Coop., Inc. v. FERC*, 684 F.2d 20 (D.C.Cir.1982), Con Ed contends that the Commission's finding that the New York and New England customers were not similarly situated should have led to a finding of undue discrimination. "Just as charging similarly situated customers different rates is unduly discriminatory," Con Ed maintains, "so too is it discriminatory to charge customers the same rate if, as FERC has found here, they are *not* similarly situated." Yet *Alabama Electric ·*does not stand for the proposition that charging the same rates to differently situated customers always constitutes undue discrimination. · Although *Alabama Electric* stated that in the "unusual case," *id.* at 21, charging the same rate to differently situated customers could constitute a form of discrimination, the critical determination was whether that difference was unreasonable or undue. *Id.* at 28. Because the Commission provided a sufficient explanation for the operational limits placed upon Con Ed, the resulting differences were not unduly discriminatory.

Nor can *Alabama Electric* be read to recognize quality of service claims such as Con Ed's as necessarily constituting undue discrimination. Although 15 U.S.C. § 717c(b)(2) forbids "any unreasonable dif-

ference in ... service," the difference in service here was not unreasonable because of operational constraints. Furthermore, the court in *Alabama Electric* held that the application of the same rate to customers who were similar in many respects could still potentially constitute undue discrimination if the rate applied to the two classes of customers yielded disparate rates of return on the costs to the pipeline to service them. *Id.* at 27–28. Because "it has come to be well established that ... rates should be based on the costs of providing service to the utility's customers," *id.*, the court concluded the critical factor in the claim of undue discrimination was a disparity in the costs of service. *Id.* at 28 & 28 n. 34; *see also Electricity Consumers Resource Council v. FERC*, 747 F.2d 1511, 1515–16 (D.C.Cir.1984).

Here, the Commission could properly find that Con Ed failed to make an adequate showing regarding such costs to justify a downward rate adjustment. 80 F.E.R.C. at 61,247. A witness for Con Ed referred to testimony by Tennessee's expert that there were additional costs in monitoring pressure control and in maintaining the New England lateral pipelines, all of which operationally contribute to New England's greater flexibility; the Con Ed witness also testified that only 50% of those costs were directly incurred by New England customers, and the rest borne by others on the system, despite the benefit to New England customers. However, merely asserting that the direct assignment of 50% of the lateral costs to New England customers was insufficient to reflect the cost of additional flexibility is not the same as submitting evidence in support of such a claim. Under section 5 of the NGA, *see Sea Robin Pipeline*, 795 F.2d at 184, Con Ed had the burden to justify a change in rates, yet it submitted no cost

allocation studies on providing hourly flexibility to New England customers in comparison to those in New York. The evidence in the record demonstrates neither "that Tennessee incurs less costs in providing to the New York customers a service with limited flexibility than it does in providing the more flexible service to the New England customers, ... [nor] that Tennessee incurs more costs to provide the New England customers with the extra flexibility." 80 F.E.R.C. at 61,247; *cf. Alabama Elec.*, 684 F.2d at 28 & 28 n. 34. Moreover, the Commission found that Con Ed had not sufficiently shown that the quality of service it received was necessarily inferior to the service received by New England customers to warrant an adjustment in rates. *See* 80 F.E.R.C. at 61,246. The New England customers' service was not firm, *see* 76 F.E.R.C. at 61,138, and the Commission noted that the record reflected that in some regards, the service to Con Ed may be better than that in New England. 80 F.E.R.C. at 61,246.

## C. *Conclusion*

Because the Commission's refusal to order Tennessee to provide Con Ed with a rate adjustment on the grounds of undue discrimination was reasoned and supported by the record, we deny Con Ed's petition for review.

Accordingly, we deny the petitions for review filed by JMC Power, Equitable, and Con Ed.

*So ordered.*