Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 15, 2004        Decided July 30, 2004

No. 03-1027

ENTERGY SERVICES, INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

AQUILA MERCHANT SERVICES, INC. AND
LOUISIANA PUBLIC SERVICE COMMISSION,
INTERVENORS

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

*John S. Moot* argued the cause for petitioner. With him on the briefs was *William S. Scherman*.

*Beth G. Pacella*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. On the brief

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

were *Cynthia A. Marlette*, General Counsel, *Dennis Lane*, Solicitor, and *David H. Coffman*, Attorney.

Before: SENTELLE, ROGERS and GARLAND, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: Entergy Services, Inc. ("Entergy" or "petitioner"), an electricity utility system owning and operating both transmission facilities and generation resources, petitions for review of a Federal Energy Regulatory Commission ("FERC" or "the Commission") order finding that Entergy had unreasonably discriminated against competitors by keeping transmission capacity off the market in violation of FERC Order No. 888. Entergy contends that the order is arbitrary and capricious. For the reasons more fully set forth below, we deny the petition and uphold FERC's order.

## I. Background

1. *Regulatory Background*

The Federal Power Act ("FPA" or "Act") grants FERC jurisdiction over the sale or resale and the transmission of electric energy in interstate commerce. *See generally* FPA §§ 201(b), 205 and 206, 16 U.S.C. §§ 824(b), 824d and 824e. In 1996, FERC acted upon evidence of pervasive discrimination in the transmission of electric power by completing a massive regulatory revision, culminating in Order No. 888. *Promoting Wholesale Competition Through Open Access Nondiscriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996), 61 Fed. Reg. 21,540 ("Order No. 888"), *on reh'g*, Order No. 888–A, FERC Stats. & Regs. ¶ 31,048, 62 Fed. Reg. 64,688 (1997), *on reh'g*, Order No. 888–B, 81 FERC ¶ 61,248 (1997), *on reh'g*, Order No. 888–C, 82 FERC ¶ 61,046 (1998), *aff'd*, *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000) ("*TAPS*"), *aff'd sub nom.*, *New York v. FERC*, 535 U.S. 1 (2002). Specifically, FERC concluded that public utilities that owned, controlled,

or operated facilities for transmitting electric energy in interstate commerce ("transmission providers") were using their control over such facilities to favor their own sales to the detriment of competing sellers and consumers. *Id.* ¶¶ 31,682, 31,919–26; Order No. 888–A at 30,210. Invoking its authority under FPA §§ 205 and 206, FERC imposed three requirements relevant to the present petition to remedy that discrimination. First, the Commission required transmission providers to make available open access transmission, i.e., to offer transmission services to all eligible parties on a nondiscriminatory basis. Order No. 888, ¶ 31,635. *See* 18 C.F.R. § 35.28(c)(1). Second, the Commission required providers to unbundle their wholesale services, i.e., to offer separate sales, transmission, and "ancillary" services. *See New York v. FERC*, 535 U.S. 1 at 11 (2002). Third, the order required providers to take transmission service to serve their own wholesale customers (wholesale "load") and unbundled retail load on the same terms offered other transmission customers. *See* 18 C.F.R. § 35.28(c)(2).

The Commission implemented the new regulatory scheme, in part, by promulgating a pro forma Open Access Transmission Tariff ("OATT") that includes the minimum terms and conditions under which transmission providers may offer service. *See* Order No. 888–A at 30,503–43 (containing the final OATT); 18 C.F.R. § 35.28(c)(1) (requiring all transmission providers to have on file a tariff equivalent to the OATT "or such other open access tariff as may be approved by the Commission consistent with Order No. 888"). Previously, transmission providers had provided two main services: "unbundled" transmission, in which they delivered electric power purchased by a transmission customer from a specified origination point to a specified destination at a specified transmission rate; and "bundled" sales, in which they delivered and sold electric power to the customer at a single rate that encompassed both the transmission and power costs. The OATT replaces the first of these services with "point-to-point" service, and partially replaces the second with "network integration service."

The point-to-point transmission service, addressed in Part II of the OATT, is transmission service from a specified point of receipt to a specified point of delivery. *See* Order No. 888–A, ¶ 30,510 § 1.35. Point-to-point service can be "firm," not subject to a prior claim, or "non-firm," subject to interruption. *Id.* ¶ 30,509 § 1.27. "Network integration transmission service," addressed in Part III of the OATT, is a flexible service, which allows the transmission provider to service a network customer's load by using multiple receipt and delivery points. All network transmission service is firm. A "network customer" is an entity receiving network integration transmission service. *Id.* ¶ 30,509 § 1.20.

A transmission provider that uses transmission facilities to serve its own wholesale and/or unbundled retail load must take transmission service for such loads under its OATT. 18 C.F.R. § 35.28(c)(2). However, transmission providers need not take transmission service under the OATT to serve their bundled retail load. *See* Order No. 888–A ¶ 30,217 (to the extent that "the transmission of purchased power to the bundled retail customers . . . takes place over [the] transmission provider's facilities," the OATT does not have to be used for "such transmission") (footnote omitted).

Order No. 888 requires that "network service customers receive service comparable to the services" provided to the provider's historical customers. The Preamble to Part III of the OATT requires that a transmission provider offer its network transmission service in a manner that allows the "network customer" to serve its "network load" in a manner "comparable to that in which the Transmission Provider utilizes its Transmission System to serve its Native Load Customers." Order No. 888–A ¶ 30,529–30. *See also id.* ¶ 30,536 § 33.2 (providing that during periods of transmission constraints, the transmission provider may not "redispatch" power in a manner that unduly discriminates between its "use of the Transmission System on behalf of its Native load Customers and any Network Customer's use of the Transmission System to serve its designated Network Load").

Order No. 888 expressed the concern that "a transmission customer" might have an incentive to "reserve certain capacity simply to prevent everyone else from using it[.]" Order No. 888 at 31,693. The Commission addressed this concern in two ways. First, it required a network transmission customer, as a prerequisite to obtaining network transmission service, to designate those "network resources" that would generate the power to be transmitted over the reserved capacity. Order No. 888–A at 30,531–32 § 29.2(v). Second, this concern was addressed by allowing the customer to designate only generation that it owned or had signed a contract to purchase. *Id.* ¶ 30,533 § 30.7. This "designation requirement" helped assure that the "transmission customer" and the "transmission provider" would have "an incentive not to oversubscribe" to capacity requirements, because the costs of these "excessive margin requirements [would] be prohibitive." Order No. 888 ¶ 31,754.

FERC's concerns regarding the tying up of capacity led it to examine transmission providers' reservation of capacity to serve bundled retail load. While deciding not to require transmission providers to take transmission service for their bundled retail sales under the OATT, the Commission recognized that the providers' reservation of capacity for such service would have a direct impact on the capacity available to other customers taking firm transmission service under the OATT. Order No. 888 at 31,745.

To assure that transmission providers did not reserve more capacity than was needed to serve bundled retail load, FERC allowed transmission providers to reserve only such capacity as was needed to serve existing native load demand, or that would be needed to serve reasonably forecasted native load growth. Order No. 888 at 31,745. In addition, transmission providers had to make the latter capacity available to other shippers until it was actually needed to meet native load requirements. *Id.*

Specifically, OATT § 28.2 requires that transmission providers seeking to reserve capacity to serve their native load customers designate network resources. The provision states:

The Transmission Provider, on behalf of its Native Load Customers, shall be required to designate resources and loads in the same manner as any Network Customer under Part III of this Tariff.

*Id.* ¶ 30,530 § 28.2.

2. *Administrative Proceedings*

Entergy is an integrated energy company engaged primarily in electric power production, retail distribution operations, energy marketing and trading, and gas transportation. Entergy owns and operates power plants with about 30,000 megawatts ("MW") of electric generating capacity, delivering electricity to 2.6 million utility customers in Arkansas, Louisiana, Mississippi, and Texas. On March 30, 1998, one of Entergy's wholesale customers—Aquila Power Corporation ("Aquila")—filed a complaint, amended on June 23, 1998, against Entergy, charging that Entergy had reserved 2,000 MW of firm capacity at separate interconnections with four different transmission providers for the purpose of importing power to serve its native load; but without designating any network resources in connection with these reservations. *Aquila Power Corp. v. Entergy Servs., Inc.*, 90 FERC ¶ 61,260 at 61,858–59 (2000).

On March 16, 2000, FERC found that Entergy had "reserved virtually all of the firm interface capacity on four key interfaces, even though it had no off-system network resources." *Id.* ¶ 61,859. The Commission ruled that by reserving transmission capacity without designating associated network resources, Entergy violated OATT § 28.2. 90 FERC ¶ 61,260 ("March 16, 2000 Order"). The Commission granted the complaint as to this issue and directed Entergy to cease its violations. *Id.* On April 17, 2000, Entergy requested rehearing, which was denied on July 26, 2000. 92 FERC ¶ 61,064 (2000) ("July 26, 2000 Order"). On August 25, 2000, Entergy filed a second request for rehearing, which was denied by order dated December 20, 2002. 101 FERC

¶ 61,328 (2002) ("December 20, 2002 Order").  This petition for review followed.

## II.  Analysis

Entergy states the question before us is "whether FERC was arbitrary and capricious in holding that Entergy violated its OATT by failing to reserve transmission service under the OATT for its bundle retail customers, despite the fact that Order No. 888 held that FERC would not regulate transmission service to bundled retail load."  It argues that Order No. 888 makes clear that "we are not . . . requiring that bundled retail service be taken under the terms of the Final Rule pro forma tariffs."  Pets. Br. at 9 quoting Order No. 888 ¶ 31,745. It argues that in the orders under review FERC exceeded the scope of Order No. 888.  Specifically, Entergy contends that in Order No. 888, FERC required a utility to offer an open access tariff to its wholesale customers under a standard filed tariff, the OATT, which would place a transmission provider and its competitors on equal footing by requiring each utility to state separate rates for its wholesale generation, transmission and ancillary services, and to take transmission of its own wholesale sales and purchases under a single general tariff applicable equally to itself and others. *New York*, 535 U.S. at 11.  Entergy contends that FERC, however, is not empowered under Order No. 888 to impose obligations under the OATT on the transmission component of bundled retail sales—the type of service at issue here. According to Entergy, FERC's statement in the preamble to Order No. 888 that "we are not requiring the transmission provider to unbundle transmission service to its retail native load nor are we requiring that bundled retail service be taken under the terms of the Final Rule pro forma tariff."  Order No. 888 ¶ 31,745, precludes FERC from imposing the obligation of designating network resources relevant to such sales under OATT § 28.2.  FERC obviously disagrees, as do we.

At issue here is FERC's interpretation of a final regulation. We defer to an agency interpretation of its own regulation so

long as it is not "plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945). Similarly, we defer to FERC's interpretation of its orders so long as the interpretation is reasonable. *See, e.g., East Texas Elec. Coop. v. FERC*, 218 F.3d 750, 753–54 (D.C. Cir. 2000). FERC's interpretation of the OATT is not only reasonable, it follows the explicit language of the tariff. OATT § 29.2(v) requires a network customer to designate, as a prerequisite to obtaining network transmission service, the "network resources" that will generate the power to be transmitted over the reserved capacity. *See* Order No. 888–A ¶ 30,531–32 § 29.2(v). And OATT § 28.2 likewise requires a transmission provider to designate network resources used to serve "Native Load Customers." *Id.* ¶ 30,530 § 28.2. The definition of "Native Load Customers"in OATT § 1.19 supports this conclusion:

> [W]holesale and retail power customers . . . on whose behalf the Transmission Provider . . . has undertaken an obligation to construct and operate the Transmission Provider's system to meet the reliable electric needs of such customers.

*Id.* ¶ 30,508 § 1.19. The Commission's interpretation of OATT § 28.2 as requiring transmission providers to designate network resources when reserving capacity to serve bundled retail load was certainly not plainly erroneous or inconsistent with the provision's language.

Entergy, however, argues that applying OATT to its reservation with the stated purpose of supplying bundled retail customers is inconsistent with the express terms of Order No. 888, which declared that it did not regulate retail commerce. Again, we disagree.

Specifically, Entergy contends that the preambles to Order No. 888 and its progeny "clearly limited the scope of the OATT, applying it only to new wholesale or unbundled retail sales." Pet. Br. at 13 (citing Order No. 888 at 31,745 and Order No. 888–A at 30,217). The portion of 888–A upon which petitioner relies states:

> In a situation in which a transmission provider purchases power on behalf of its retail native load customers, the Commission does not have jurisdiction over the transmission of the purchased power to the bundled retail customers insofar as the transmission takes place over such transmission provider's facilities, *and therefore the pro forma tariff does not have to be used for such transmission.*

Emphasis added. Petitioner therefore argues that FERC's interpretation of OATT § 28.2 as requiring it to designate network resources is improper. Like the Commission, we reject this argument. The Commission's interpretation reflects the plain meaning of the language of OATT § 28.2, and Entergy's interpretation cannot be reconciled with that language. Insofar as the language of § 28.2 is viewed as inconsistent with extracts from the preambles of the Orders, FERC correctly notes that "language in the preamble of a regulation is not controlling over the language of the regulation itself." *Wyoming Outdoor Council v. U.S. Forest Service*, 165 F.3d 43, 53 (D.C. Cir. 1999). But we need not decide how much weight to give the statements Entergy relies upon because we are not convinced there is any irreconcilable inconsistency between those statements and the OATT in the first place. The Commission explained that its interpretation of OATT § 28.2 does "not require a transmission provider to obtain transmission service under the tariff when purchasing power on behalf of bundled retail native load customers," but only "require[s] transmission providers to designate resources in the same manner as any network customer under the tariff." 92 FERC at 61,064. FERC's explanation is eminently sensible.

Entergy argues that the regulatory position FERC chose in this case is inconsistent with its self-limitation in Order 888 as upheld by the Supreme Court in *New York v. FERC*, 535 U.S. 1 (2002). Specifically, Entergy reminds us that the Supreme Court noted "FERC rejected a proposal that the open access requirement should apply to 'the transmission component of bundled retail sales.'" *Id.* at 1 (quoting Order 888 at 31,699). However, we do not see any irreconcilable inconsistency between FERC's decision under review and its

express policy in Order 888. The referenced FERC "rejection" is most easily understood as a refusal to exercise jurisdiction to provide a specific and direct regulatory remedy—"functional unbundling"—that would require each utility "to take transmission of its own wholesale sales and purchases under a single general tariff." *Id.* at 11.

FERC's interpretation of OATT § 28.2 does not require a regulated entity to execute a service agreement, to be bound by the tariff rates and conditions of the OATT, or to do anything else involved in obtaining service under the tariff. It requires, and only requires, that the entity designate network resources. The Commission has explained its purpose in imposing that requirement, a purpose not only consistent with Order 888, but perhaps essential thereto: preventing transmission providers from blocking capacity that would otherwise be sought and used by its transmission customers. This very case illustrates the reasonableness of FERC's decision. But for FERC's application of OATT § 28.2, Entergy would have used its firm transmission reservation to enable it to purchase power whenever it was economical for it to do so, "while den[ying] all firm transmission requests and entertain[ing] non-firm transmission requests only when it was unable to make an economic deal for itself." 90 FERC at 61,260. For that reason, FERC has applied OATT § 28.2 to other transmission providers in Entergy's position in two previous cases. *Wisconsin Public Power Inc. v. Wisconsin Public Service Corp.*, 83 FERC ¶ 61,198 (1998); *Morgan Stanley Capital Group v. Illinois Power Co.*, 83 FERC ¶ 62,204 (1998). FERC therefore offers not just a reasonable interpretation of § 28.2; it offers a consistent interpretation as well.

In short, the Commission's interpretation of the OATT does not conflict with other portions of Order 888 and is reasonable and will be upheld. We note in passing that Entergy makes other arguments, none of which overcome the reasonableness of FERC's interpretation. Arguably, Entergy's claim that the Commission's ruling will discourage utilities from arranging importations of power from other systems, and thereby threaten system reliability, is not even properly before us, as

not timely raised before the Commission. Be that as it may, we need not separately discuss either it or the other arguments advanced by petitioner as the interpretation by the Commission readily survives our standard of review.

### III. Conclusion

For the reasons set forth above, we deny the petition for review.