# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 22, 2008       Decided March 7, 2008

No. 06-1286

TRANSCONTINENTAL GAS PIPE LINE CORPORATION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

PIEDMONT NATURAL GAS COMPANY, INC., ET AL.,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Gregory Grady* argued the cause for petitioner. With him on the briefs were *Michael J. Thompson*, *Randall R. Conklin*, and *David A. Glenn*.

*Beth G. Pacella*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Cynthia A. Marlette*, General Counsel, and *Robert H. Solomon*, Solicitor. *John S. Moot*, Attorney, entered an appearance.

Before:  TATEL, BROWN, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* BROWN.

TATEL, *Circuit Judge*:  Its existing pipeline too small to carry gas shipped by several new customers, petitioner Transcontinental Gas Pipe Line Corp. (Transco) expanded its pipeline and installed new compressors to push the added gas through the larger pipeline.  In keeping with its normal practice, Transco sought to distribute the additional electricity costs of running the new compressors among all its customers.  The Federal Energy Regulatory Commission, no longer supportive of that approach, instead directed the company to allocate the costs only to the customers for whom the pipeline expansion was undertaken.  Transco petitions for review, arguing that FERC: (1) acted arbitrarily and capriciously, and (2) failed to show that Transco's proposal was unjust and unreasonable and that FERC's alternative was just and reasonable.  We disagree on both counts and deny the petition.

## I.

Transco operates a natural gas pipeline system that connects Gulf of Mexico production sites with customers along the Eastern seaboard.  Its system consists of large pipelines and nearly 350 compressors that move gas through the pipelines.  This case arises out of Transco's "Cherokee" project, which, in order to accommodate several new shippers, expanded Transco's main pipeline in Alabama and added new compressors to push the additional gas through the expanded system.

After completing the Cherokee project, Transco filed new proposed rates with FERC pursuant to the Natural Gas Act (NGA), 15 U.S.C. § 717 *et seq.*, which gives FERC authority to review proposed rates and assure that they are "just and reasonable." *Id.* § 717c(a). Under NGA section 4, a pipeline proposing new rates must "prove [to FERC] that its proposed rates are just and reasonable." *Consol. Edison Co. of N.Y., Inc. v. FERC*, 165 F.3d 992, 1007 (D.C. Cir. 1999) (citing 15 U.S.C. § 717c). By contrast, "when the Commission or an intervenor seeks to impose on the pipeline rates different from either present rates or rates proposed by the pipeline," NGA section 5 applies and "the Commission or the intervenor must prove that the pipeline's present rates are not just and reasonable and that the new rates proposed by the Commission or the intervenor are just and reasonable." *Id.* (citing 15 U.S.C. § 717d). Also relevant here, under longstanding FERC policy, "[t]he cost of [new facilities] may be recovered in either of two ways: through 'incremental' pricing, which imposes an additional charge payable solely by customers who are directly served by the expansion facilities . . . ; or 'rolled-in' pricing, in which the cost[s] of the new facilities are added to the pipeline's total rate base and reflected in rates charged to all customers system-wide." *Midcoast Interstate Transmission, Inc. v. FERC*, 198 F.3d 960, 964 (D.C. Cir. 2000) (citing *TransCanada PipeLines Ltd. v. FERC*, 24 F.3d 305, 307 n.1 (D.C. Cir. 1994)).

Transco had always rolled in compressor energy costs, and in its rate filing with FERC, it sought to do the same with the costs of running the Cherokee compressors. Under this approach, all customers paid a pro rata share of all compression power costs, and would for the Cherokee compressors as well. Several Transco customers objected, arguing that because Transco had undertaken the Cherokee project to benefit new customers and needed the added

compression only for their benefit, the new customers should pay the full power costs of the additional compressors.

Following a hearing, an administrative law judge found that the parties challenging Transco's proposed rate had demonstrated that it was unjust and unreasonable because it conflicted with a 1999 FERC policy statement expressing the Commission's goal of charging only those customers who benefit from a project for the costs of that project. Transcontinental Gas Pipe Line Corp., 101 F.E.R.C. ¶ 63,022 at 65,095-96 (2002) (citing Certification of New Interstate Natural Gas Pipeline Facilities, 88 F.E.R.C. ¶ 61,227 (1999) ("1999 Policy Statement")). The ALJ also found that the challenging parties had shown that their alternative pricing approach was just and reasonable. *Id.* Under that approach, the new customers for whose benefit the expansion was undertaken would pay all the power costs of the project's compressors, as well as paying their pro rata share of the power costs of the rest of Transco's system. The Commission affirmed the ALJ's order. Transcontinental Gas Pipe Line Corp., 106 F.E.R.C. ¶ 61,299 at 62,125-26 (2004). Transco now petitions for review, arguing first that FERC acted arbitrarily and capriciously, and second that FERC failed to demonstrate that Transco's proposed rate was unjust and unreasonable and that FERC's alternative was just and reasonable.

## II.

We "review FERC orders under the Administrative Procedure Act's . . . arbitrary and capricious standard," *Sithe/Independence Power Partners, L.P. v. FERC*, 165 F.3d 944, 948 (D.C. Cir. 1999), under which "[w]e must uphold an agency's action where it 'has considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" *Nat'l Ass'n of Clean Air Agencies v.*

*EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (quoting *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 68 (D.C. Cir. 2000)). Our review is "'particularly deferential' when FERC is involved in the highly technical process of ratemaking," *E. Ky. Power Co-op, Inc. v. FERC*, 489 F.3d 1299, 1306 (D.C. Cir. 2007) (quoting *Ass'n of Oil Pipe Lines v. FERC*, 83 F.3d 1424, 1431 (D.C. Cir. 1996)), and we "accept the Commission's factual findings if they are supported by substantial evidence." *Id.* (citing 16 U.S.C. § 825*l*(b)).

Transco offers several reasons why it thinks FERC acted arbitrarily and capriciously when it directed that the Cherokee electricity costs be priced incrementally. All lack merit.

First, Transco argues that FERC erred in relying on its 1999 Policy Statement because that statement dealt only with capital costs, not power costs. The 1999 Policy Statement, however, is far broader than Transco admits. The statement announces the Commission's general goal of eliminating the subsidization of new customers by existing customers: "Under the Commission's no-subsidy policy, existing shippers should not have the rates under their current contracts changed because the pipeline has built an expansion to provide service to new customers." Certification of New Interstate Natural Gas Pipeline Facilities: Order Clarifying Statement of Policy, 90 F.E.R.C. ¶ 61,128 at 61,392 (2000). We think FERC reasonably concluded that this language could cover the operational costs of expansion projects as well as their capital costs, and "we defer to FERC's interpretation of its orders so long as the interpretation is reasonable." *Entergy Servs., Inc. v. FERC*, 375 F.3d 1204, 1209 (D.C. Cir. 2004).

Second, Transco argues that FERC incorrectly found that existing Transco customers would subsidize the Cherokee shippers if the electricity costs of the new compressors were rolled in, and relied on this mistaken conclusion in issuing its order. To be sure, FERC's concerns about subsidization did play a major role in its decision. The Commission found that existing Transco customers had no need for the new compressors, that powering the new compressors cost $2.4 million each year, and that if the electricity costs were rolled in, Cherokee shippers would pay only $135,000 of that amount. *See* 101 F.E.R.C. ¶ 63,022 at 65,095; 106 F.E.R.C. ¶ 61,299 at 62,125-26. From these facts, FERC concluded that rolling in rates would, contrary to the 1999 Policy Statement, force existing Transco customers to subsidize the Cherokee shippers. 106 F.E.R.C. ¶ 61,299 at 62,125-26.

Transco disputes neither that its existing customers had no need for the new compressors, nor that its new customers would pay only $135,000 of the $2.4 million annual power costs of operating them. Instead, it claims there is no subsidy because the Cherokee compressors benefit all Transco customers by compressing gas from all shippers, not just Cherokee shippers. Moreover, Transco insists, the added compression "improves overall system flexibility, as well as reliability, e.g., facilitating continuation of service without interruption in the event of compressor maintenance or outage." Pet'r's Br. 13. Transco also suggests that the new compressors produced a smaller increase in system-wide power costs than FERC believed because the new compressors caused other compressors to be "used less than they otherwise would have been." *Id.* at 14.

FERC considered and reasonably rejected these arguments. Responding to Transco's claim that the new compressors benefited all customers, FERC said:

> [U]nder the 1999 Pricing Policy Statement . . . , a claim of generalized system benefits is not enough to justify requiring the existing shippers to subsidize the uncontested increase in electric costs caused by the Cherokee project. . . . There is no showing that the added compression . . . has improved the quality of service received by the existing shippers. While [Transco] claim[s] that the added compression provides redundancy and potential backup when older compressors are out of service or undergoing maintenance, there has been no showing that there were any service interruptions in the past which would have been prevented by the installation of the new compressors.

Transcontinental Gas Pipe Line Corp., 112 F.E.R.C. ¶ 61,170 at 61,924 (2005) (footnote omitted). FERC's factual findings in this passage were all supported by substantial evidence: Transco presented no proof of any specific benefits to its existing customers from the Cherokee project. And FERC reasonably concluded that generalized system benefits are insufficient to justify rolling in rates under its 1999 Policy Statement given that statement's directive that rolling in rates is not justified "simply because the existing customers receive some benefit from the construction of the new facilities." 90 F.E.R.C. ¶ 61,128 at 61,394 (citation and internal quotation marks omitted). Furthermore, even if, as Transco asserts, the Cherokee compressors caused less of an increase in system-wide power costs than FERC believed—an assertion Transco provided no hard numbers to support—FERC still correctly concluded that existing customers would have, at least to some extent, subsidized the Cherokee shippers if Transco had been allowed to roll in rates. While we recognize that

Transco's existing customers indirectly benefit from the added compressors, we are bound to respect FERC's policy decision that such benefits fail to justify imposing substantial new costs on captive customers who have no need for the added compression.

Finally, Transco claims FERC's new approach will make its system less efficient because it will have to run its compressors based on which customers pay for them rather than using the compressors that will most efficiently move gas through the system. FERC's new approach may well be less efficient than Transco's existing pricing, but FERC thought it more important to avoid subsidization of new shippers than to ensure the most efficient use of compressors—exactly the type of policy choice about which we defer to FERC, especially given that our review is "'particularly deferential' when FERC is involved in the highly technical process of ratemaking." *E. Ky. Power*, 489 F.3d at 1306 (quoting *Ass'n of Oil Pipe Lines*, 83 F.3d at 1431).

## III.

"Under NGA § 5, before replacing an existing rate or tariff with a new one, the Commission must demonstrate by substantial evidence that the existing rate or tariff has become unjust or unreasonable, and that the proposed rate is both just and reasonable." *Am. Gas Ass'n v. FERC*, 428 F.3d 255, 263 (D.C. Cir. 2005) (citing 15 U.S.C. § 717d; *W. Res., Inc. v. FERC,* 9 F.3d 1568, 1579-80 (D.C. Cir. 1993)). Transco claims that FERC flunked both parts of this test because it failed to demonstrate any problem with Transco's current rate and to explain, much less justify, the new rate it imposed. We disagree.

FERC provided substantial evidence showing that Transco's existing rate was unjust and unreasonable. Rolling in the power costs of the Cherokee compressors forced existing Transco customers to subsidize the power costs of compressors they had no need for—a result FERC thought unacceptable under its 1999 Policy Statement. *See* 90 F.E.R.C. ¶ 61,128 at 61,393 ("Existing shippers . . . should not be subject to increases in rates during the term of their existing contracts to reduce the rates faced by new shippers subscribing to expansion capacity.").

FERC also adequately explained the new rate it imposed:

> [T]he structure for fuel and electric charges should be as described in Northwest Pipeline Corporation, 99 FERC ¶ 61,365 at ¶ 37 (2002)[,] where the Commission stated that "expansion shippers are to pay both the compressor fuel rate charged to existing shippers and any additional fuel costs attributable to the proposed expansion, with the additional fuel costs captured in the surcharge . . . . The incremental fuel surcharge is intended to amount to the difference between the proposed incremental fuel rate and the existing compressor fuel rate."

106 F.E.R.C. ¶ 61,299 at 62,126. Although the first sentence of this passage is crystal clear, Transco insists—as we understand its argument—that the second sentence leaves the rate unclear by suggesting that Cherokee shippers will have to pay only the electricity costs of the Cherokee compressors, rather than also paying their pro rata share of electricity costs throughout the rest of the system. But as we read the second sentence, and as FERC's counsel confirmed at oral argument,

the "proposed incremental fuel rate" mentioned in the second sentence represents the final total rate to be charged Cherokee shippers. That rate has two components: (1) "the existing compressor fuel rate," i.e., the Cherokee customers' share of the system-wide fuel costs, and (2) the "incremental fuel surcharge," i.e., the cost of electricity just for the Cherokee project. Thus, as FERC reiterated in its order on rehearing: "expansion shippers are to pay both the [system-wide] fuel rate charged to existing shippers and any additional fuel costs attributable to the proposed expansion." 112 F.E.R.C. ¶ 61,170 at 61,925 (quoting Nw. Pipeline, 99 F.E.R.C. ¶ 61,365 at 62,541).

Finally, though we think it a close question, FERC adequately justified the rate it imposed. As Transco points out, FERC's explanation in its initial decision of why it imposed the rate it did appears in only two relatively unilluminating sentences:

> [T]he just and reasonable replacement for the system-wide fuel and electric power cost rates charged to the Cherokee . . . shippers is an incremental rate for electric compression based on Transco's most recent operating experience. . . . Transco . . . concedes that . . . [it] can determine how much fuel or electric power is used to operate any particular compressor unit over a particular time.

106 F.E.R.C. ¶ 61,299 at 62,126 (citation and internal quotation marks omitted). Yet prior to these two sentences, FERC had repeatedly discussed its goal—expressed in the 1999 Policy Statement—of avoiding subsidization of new shippers by existing shippers. *See, e.g.*, *id.* at 62,114, 62,126.

Moreover, on rehearing, FERC clarified that the 1999 Policy Statement justified the rate it imposed:

> [T]he 1999 Pricing Policy Statement must be applied to this project. Thus, . . . a showing that Transco's existing shippers are subsidizing additional fuel or electric power costs incurred in order to serve the Cherokee shippers would justify requiring incremental charges to the Cherokee shippers.

112 F.E.R.C. ¶ 61,170 at 61,924. Because the Commission made just such a finding—i.e., that rolling in rates would force existing shippers to subsidize the Cherokee shippers—the 1999 Policy Statement "justif[ied] requiring incremental charges to the Cherokee shippers." *Id.*

Thus, although FERC's explanation in its initial decision for imposing incremental rates left something to be desired, the decision as a whole and the rehearing decision clarify its analysis, and "we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). Here we can discern the Commission's path from its goal of avoiding subsidization to the rule it imposed, especially given that, as FERC pointed out, it had imposed precisely this rule in several recent cases presenting the same issue. *See* 101 F.E.R.C. ¶ 63,022 at 65,096 (citing PG&E Gas Transmission, Nw. Corp., 99 F.E.R.C. ¶ 61,366 (2002); Kern River Gas Transmission, 98 F.E.R.C. ¶ 61,205 (2002)).

In reaching this conclusion, we are not, as the dissent suggests, "speculat[ing] that the 1999 Policy Statement[] . . . could justify the new rates." Dissenting Op. at 4. To the contrary, FERC's decision on rehearing makes quite clear that

the 1999 Policy Statement was the reason FERC imposed incremental rates, 112 F.E.R.C. ¶ 61,170 at 61,924, and the dissent does not quarrel with our conclusion in Part II that FERC reasonably applied the 1999 Policy Statement to power costs.

Our dissenting colleague also argues that FERC failed to consider adequately the efficiency and cost-shifting effects of its order. But FERC acknowledged Transco's argument that its new rule would reduce system efficiency, 112 F.E.R.C. ¶ 61,170 at 61,922, and concluded that this risk was outweighed by the need to avoid subsidization. As to cost shifting, FERC found that "the annual cost of electricity used by the . . . Cherokee compressors is $2,380,399," while "Cherokee shippers pay only $135,151 annually in electricity costs, resulting in a $2,245,248 subsidy from existing shippers." 106 F.E.R.C. ¶ 61,299 at 62,125. Never disputing these numbers, Transco argues only that: (1) generalized system benefits justify the subsidy; (2) no subsidy exists because the system is integrated; and (3) FERC's approach will lead to reverse subsidies. But FERC rejected the first and second arguments as insufficient under the 1999 Policy Statement, *id.* at 62,126, and Transco provided no evidence to support its third argument. As FERC explained:

> Transco[] cannot simply sit back and make vague allegations of offsetting benefits and then contend that the proponents of section 5 action have failed to meet their burden of showing that the existing shippers are subsidizing the additional electric power costs incurred as a result of the Cherokee expansion. This is particularly the case [here], where Transco has possession of the information needed to estimate the value of any benefit

accruing to existing customers from the Cherokee shippers' contribution to fuel costs.

112 F.E.R.C. ¶ 61,170 at 61,924-25.

## IV.

Having considered Transco's remaining arguments and found them without merit, we deny the petition for review.

*So ordered.*

BROWN, *Circuit Judge*, concurring and dissenting:  While I agree with most of the majority's conclusions, I dissent from its holding that FERC satisfied the section 5 burden of showing the new rates it wants to impose on Transco are just and reasonable.

I

To accommodate the demands of its Cherokee customers, Transco increased its pipeline's capacity by installing new compressors and then charging these customers to cover the construction costs.  Transco then sought to continue its practice of charging all of its customers for the energy costs for running all compressors (including the new compressors), in proportion to each customer's actual usage.  After some of Transco's mainline customers challenged these rates, FERC ordered Transco to make the Cherokee customers pay the same proportional rate as mainline customers for running the preexisting compressors *and also pay the entire energy costs for running the Cherokee compressors.  See Transcon. Gas Pipe Line Corp.*, 106 F.E.R.C. ¶ 61,299, 62,126 (2004); Resp't's Br. 9, 27.  At the same time, the mainline customers would pay only their proportionate energy costs for running the preexisting compressors.  Transco points out these new rates are illogical because its pipeline operates on an integrated basis, so all of its compressors serve all of its customers.  Once new compressors are up and running, they push natural gas through the pipeline to all customers, and it makes no sense to attribute these compressors' usage only to the Cherokee customers.

When a pipeline proposes new rates under NGA section 4, it has the burden of showing these rates are just and reasonable.  Normally, if FERC rejects a section 4 rate change, this court simply defers to FERC's rate-setting

expertise. However, when FERC or intervenors seek to impose new rates under NGA section 5, they have the burden of showing the new rates are just and reasonable. *See "Complex" Consol. Edison Co. of N.Y., Inc. v. FERC*, 165 F.3d 992, 1000–01 (D.C. Cir. 1999) (per curiam). "[T]his court has *strictly policed* the statutory line that separates" section 4 and section 5. *Id.* (emphasis added). Since this is a section 5 case, FERC has to show the rate-change proponents carried their burden of demonstrating the new rates are just and reasonable. In fulfilling this obligation, FERC has to do more than make mere "conclusionary statements"; it must "examine the cost-shifting effect of its order[]." *See Algonquin Gas Transmission Co. v. FERC*, 948 F.2d 1305, 1312, 1315 (D.C. Cir. 1991). The panel majority fails to hold FERC to this obligation and thus undermines the distinction between section 4 and section 5.

II

As the majority concedes, FERC's only explicit justification for the new rates is a "relatively unilluminating," maj. op. 10, claim that Transco "'can determine how much fuel or electric power is used to operate any particular compressor unit over a particular time,'" *id.* (quoting 106 F.E.R.C. ¶ 61,299 at 62,126). This is not just unedifying; it is completely beside the point. No one doubts Transco can determine the energy costs for running the Cherokee compressors. The question is whether FERC has shown it is just and reasonable for the Cherokee shippers to pay the full energy costs for operating these compressors, as well as paying their proportionate share for operating the preexisting compressors. This is a rather difficult task, as the Cherokee compressors serve both Cherokee and mainline customers. Far from meeting this challenge, FERC failed to grapple with

the cost-shifting and pipeline efficiency impacts of its new rates.

By not "examin[ing] the cost-shifting effect of its order[]," FERC failed to satisfy the strictures of section 5. *Algonquin Gas*, 948 F.2d at 1315; *see also North Carolina v. FERC*, 584 F.2d 1003, 1012 (D.C. Cir. 1978) (FERC cannot fail "to make findings as to the impact the plan would actually have on ultimate consumers" (emphasis omitted)). FERC's only attempt to consider costs was its finding that under Transco's preexisting rates, the annual electricity cost for running the Cherokee compressors was $2,380,399, while Cherokee customers paid only $135,151 in total energy charges. *See* 106 F.E.R.C. ¶ 61,299 at 62,125. While these figures appear vaguely nefarious at first glance, they are largely a red herring, since FERC does not argue the Cherokee compressors primarily serve the Cherokee customers. More significantly, even if these numbers indict Transco's *preexisting rates*, it was FERC's duty to consider how the *new rates* would affect actual customers, and it completely failed to do so. Notably, the passages the majority cites to argue FERC considered the cost-shifting effect of the new rates focus exclusively on Transco's preexisting rates and say nary a word about the new rates. *See* Maj. op. 12.

If anything, FERC's figures suggest the new rates will be grossly unfair and lead to reverse-subsidization. Under the preexisting rates, Transco apparently charged Cherokee and mainline customers about $135,000 in energy costs for a particular amount of natural gas. Under the new rates, Transco may have to charge the Cherokee customers roughly $2.5 million for the same amount of gas that non-Cherokee customers get for a mere $120,000.[1] While this represents

---

[1] $2.5 million is a combination of $2.38 million to run the Cherokee compressors and the $120,000 of proportional charges for running

only a rough guess about how the new rates could play out, it is notable that this is a plausible reading of the only figures FERC offers to defend these rates. Clearly, this is insufficient to satisfy FERC's section 5 burden.

FERC also failed to consider the effects the new rates will have on the pipeline's efficient operation. *See Panhandle E. Pipe Line Co. v. FERC*, 777 F.2d 739, 746 (D.C. Cir. 1985) (FERC has "large authority to take action necessary to promote the purposes of the [Natural Gas] Act, including … efficient service."). To avoid grossly overcharging the Cherokee customers, Transco may need to change from integrated operations focused on efficient provision of natural gas to rate-obsessed operations aimed at avoiding using the Cherokee compressors when serving mainline customers. As Transco's expert explained, this later approach would make running the pipeline "grossly inefficient, [since] maintenance costs would increase and reliability would be compromised [as] large turbines were cycled on and off to meet small changes in horsepower requirements as customers' loads vary from hour to hour." FERC does not grapple with this scenario or explain how it expects Transco to accommodate the new rates.

III

In an attempt to cure FERC's deficient analysis, the panel majority speculates that the 1999 Policy Statement's goal of not forcing mainline customers to subsidize capacity expansion could justify the new rates. *See* Maj. op. 10–11. Yet, FERC never explained why its concern about

---

the preexisting compressors. Since $135,000 was the proportionate costs for running both the preexisting and Cherokee compressors, $120,000 is a rough estimate of the proportional energy costs for powering only the preexisting compressors.

subsidization was the only consideration in determining whether the new rates in this case are just and reasonable. *See Pac. Gas & Elec. Co. v. FERC*, 506 F.2d 33, 38 (D.C. Cir. 1974) ("When the agency applies [a policy statement] in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.").

Even more significantly, the Policy Statement was not concerned with energy costs—it was about ensuring that new customers pay for an expansion's construction costs, something the Cherokee shippers have done. *See Certification of New Interstate Natural Gas Pipeline Facilities*, 88 F.E.R.C. ¶ 61,227 (1999), *clarified*, 90 F.E.R.C. ¶ 61,128 (2000). The majority may be correct that FERC's authority to interpret this Policy was broad enough for it to conclude that Transco's preexisting energy rates caused undesirable subsidization. *See* Maj. op. 5. However, this falls far short of satisfying FERC's section 5 burden of proving the new rates are a just and reasonable method for dealing with this problem—especially in light of the practical differences between forcing expansion customers to pay energy costs, as opposed to construction costs. As this case shows, making expansion customers pay the full costs for powering new compressors may force the pipeline to operate in a grossly inefficient manner; no similar consequences flow from forcing them to pay construction costs. Similarly, charging expansion shippers the energy costs for running certain compressors on an integrated pipeline may cause more severe reverse-subsidization than billing them for discrete capital costs undertaken for their benefit. Nothing in either FERC's 1999 Policy Statement or its orders in this case addresses these crucial distinctions.

In a section 5 case, FERC cannot simply declare the new rates are just and reasonable by relying on "conclusionary"

references to a policy statement focused on a different issue, while ignoring how these rates will affect customers and the pipeline's efficient operation. *Algonquin Gas*, 948 F.2d at 1312. After all, why is subsidization *by* existing customers more problematic than reverse-subsidization *of* existing customers?

## IV

FERC's disregard for the consequences of the new energy rates highlights its failure to take its section 5 burden seriously. I would grant Transco's petition for review.